STATE of Wisconsin, Plaintiff-Respondent,†

v.

Ralph D. ARMSTRONG,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2001AP2789 & 2002AP2979. Oral argument
March 31, 2005.—Decided July 12, 2005.*

2005 WI 119

(Also reported in 700 N.W.2d 98.)

† Motion for reconsideration denied 10-17-05.

For the defendant-appellant-petitioner there were briefs by *Jerome Buting* and *Buting & Williams, S.C.,* Brookfield, and *Barry C. Scheck, Colin Starger,* and *The Innocence Project,* New York, NY and oral argument by *Jerome Buting* and *Barry C. Scheck.*

For the plaintiff-respondent the cause was argued by *Sally L. Wellman,* assistant attorney general, with whom on the briefs was *Peggy A. Lautenschlager,* attorney general.

An amicus curiae brief was filed by *Robert R. Henak* and *Henak Law Office, S.C.,* Milwaukee, on behalf of the Wisconsin Association of Criminal Defense Lawyers.

An amicus curiae brief was filed by *Keith A. Findley, Byron C. Lichstein, John A. Pray,* and *University of Wisconsin Law School,* Madison, on behalf of the Wisconsin Innocence Project.

¶ 1. LOUIS B. BUTLER, JR., J. Ralph Armstrong seeks review of an unpublished court of appeals' decision that affirmed the circuit court's orders denying Armstrong's motions to vacate his judgment of conviction and for reconsideration. *State v. Armstrong,* Nos. 2001AP2789 and 2002AP2979, unpublished slip. op., ¶ 1 (Wis. Ct. App. May 27, 2004). The court of appeals determined that newly obtained DNA tests that established Armstrong was not the donor of certain biological evidence found at a 1980 murder scene did not create a reasonable probability that the outcome would be different on retrial.

¶ 2. We reverse the court of appeals' decision. Because (1) the DNA evidence excluding Armstrong as the donor of the physical evidence was relevant to the critical issue of identification; (2) the jury did not hear

this evidence; and (3) instead, the State used the physical evidence assertively and repetitively as affirmative proof of Armstrong's guilt, we conclude that the real controversy was not fully tried. Therefore, we reverse the circuit court's order and remand this matter to the circuit court with directions to grant Armstrong's motion to vacate the judgment of conviction and to order a new trial.[1]

I

¶ 3. On March 24, 1981, Ralph Armstrong was convicted of first-degree sexual assault and first-degree murder of Charise Kamps, contrary to Wis. Stat. §§ 940.225(1)(a) and 940.01 (1979). Armstrong was later sentenced to life plus 16 years' imprisonment.

¶ 4. On the afternoon of June 24, 1980, Jane May, Armstrong's fiancée, discovered Kamps' body in Kamps' apartment at 134 W. Gorham Street in Madison, Wisconsin. Kamps was found face down in her bed smeared with blood, naked with a bathrobe belt draped across her back.

¶ 5. Pathologist Robert Huntington concluded that Kamps most likely died from strangulation. He found substantial injury to Kamps' anus, vagina, and throat consistent with the insertion of a blunt, unyielding object.[2] He also found six bruises in tissue below the

---

[1] According to representations made by the State at Armstrong's latest postconviction motion hearing, Armstrong has to serve the remainder of a 30– to 150–year sentence in New Mexico.

[2] Brian Dillman, Kamps' boyfriend, testified that a nine to ten inch tall glass flower vase with a wide base and tapering to the top was missing from Kamps' nightstand when he viewed

scalp consistent with being struck by a blunt object. Huntington estimated that the time of death was between midnight and 3:00 a.m. on June 24.

¶ 6. Although the bed and pillows were blood-soaked, investigators found no traces of blood elsewhere in the apartment, including the bathroom. The police also found no indication the killer attempted to clean the scene or himself or herself in the apartment.[3] Police gathered forensic evidence, including finger-prints, head and pubic hairs found on and around the body and elsewhere in the apartment, purported blood evidence, and a bathrobe found on the floor next to Kamps that later revealed semen stains.

the apartment after Kamps' murder. There is no indication in the record that this glass vase was ever recovered or tested.

[3] On this point, we note that Officer Dean Fischer, a uniformed special investigator who works crime scenes, testified that he searched Kamps' apartment to identify anything which potentially was evidence; that he did not observe blood or stains anywhere else in the apartment aside from the bed; that he specifically checked the bathroom; that the bathroom in Kamps' apartment was "orderly and clean"; that he did not observe any stains in the bathroom; and that he found no blood in the bathroom.

When specifically asked, "Was there any evidence, anything which you would have noticed which would have indicated that something had been cleaned up?", Fischer answered, "Nothing that I know of." When specifically asked if any information regarding whether someone had cleaned up in the bathroom had come to his attention, Fischer answered, "No." When asked if Fischer was "specifically looking for anything which would be a clue," Fischer answered "Yes."

Thus, the jury heard testimony about whether the murderer cleaned up in Kamps' bathroom before leaving the scene. *Compare* Roggensack, J., dissenting, ¶ 172 n.4. That evidence was that the murderer did not. *Compare id.*

¶ 7. Armstrong and Kamps knew each other and were friends through Armstrong's fiancée. Armstrong admitted to being in Kamps' apartment for a brief period beginning around 9:15 and 9:25 p.m. the evening of June 23, just hours before Kamps was murdered. However, Armstrong claimed that he was not there at the times when Kamps was murdered.

¶ 8. The State built its case against Armstrong on the following: (1) that Armstrong could not have been at Kamps' apartment before her murder; (2) two witnesses made observations that placed Armstrong at Kamps' apartment around the time she was murdered; (3) physical evidence conclusively and irrefutably established Armstrong's guilt, including (a) a fingerprint identified as Armstrong's found on a water bong in Kamps' apartment; (b) semen stains on the victim's bathrobe that came from a similar secretor type as Armstrong; (c) four head hairs found in the apartment characterized by the State's expert as "consistent" and "similar" to Armstrong's; (d) traces of blood underneath Armstrong's fingernails and toenails detected the evening following the murder; (4) Armstrong had a romantic interest in Kamps that she did not return; and (5) Armstrong paid Kamps $400 in repayment of a debt and following her murder, the $400 could not be found in her apartment, while Armstrong made a $315 cash deposit the next day.

¶ 9. The following factual background combines the State's points and splits them into two main subheadings: (A) chronology of events on June 23 through June 24, 1980; and (B) evidence that placed Armstrong at the scene. Subsumed under the first subheading includes Armstrong's explanation, and the State's refutation, of his whereabouts. Subsumed under the second subheading includes the witnesses who

placed Armstrong at Kamps' apartment around the time of her death, the missing money from Kamps' apartment that implicates Armstrong as the murderer, and, finally, the physical evidence the State claimed that "conclusively" and "irrefutably" established Armstrong was the murderer.

## A. Chronology of Events on June 23 through June 24, 1980

### 1. Early Evening

¶ 10. Charise Kamps spent the evening of June 23, 1980, in the company of her friends, including Ralph Armstrong, and his fiancée, Jane May. May was Kamps' close friend and coworker at the Pipefitter on State Street, Madison, Wisconsin. Kamps was friends with Armstrong through May. In the early evening of June 23, May invited her coworkers to a small party in her apartment, located above the Pipefitter store at 519 State Street. May, Armstrong, Armstrong's brother (Steve), Kamps, and Armstrong's friend (Greg Kohlhardt) were there. May's coworkers, Judy Marty and Betsy Cornelius, joined the party after the store closed around 5:30 p.m.

¶ 11. Kamps, Armstrong, and May all consumed alcohol and used cocaine at the party. In addition, Cornelius testified that Kamps, Steve, and Armstrong also smoked marijuana.

¶ 12. Both Cornelius and Marty testified they observed Armstrong flirting with Kamps, specifically that he sat on her lap and attempted to kiss her. Marty also testified that she overheard Armstrong tell Kamps that they would talk later. Kohlhardt testified that it

was Kamps who sat in Armstrong's lap, and that "They were just being—it seems friendly toward each other, laughing and stuff."

¶ 13. At about 6:00 p.m., Kamps' boyfriend, Brian Dillman, telephoned May's apartment from McGregor, Iowa, and spoke with Kamps. Dillman testified that he loaned Armstrong $500 for the purchase of a car, and that while speaking with Kamps at the party, he overheard Armstrong giving Kamps money and indicating that it was $400 in partial repayment for the loan. May testified that both Kamps and Armstrong had told her about the $400 repayment. Kohlhardt testified that he also witnessed Armstrong giving money to Kamps, but said that he only saw two $20 bills pass between them.

### 2. 6:30 – 9:00 p.m.

¶ 14. Following the party at May's apartment, May, Kamps, Kohlhardt, Steve, and Armstrong went to a local restaurant for dinner from about 6:30 to 8:00 p.m., and then bought beer on the way to Kohlhardt's house to watch the television program MASH. A member of the Madison Police verified a newspaper television schedule showing MASH played from 8:00 to 8:30 p.m. that evening. Immediately following the conclusion of MASH, the group left Kohlhardt at Kohlhardt's house.

¶ 15. There is some confusion as to when the group drove to Armstrong's apartment, located at 5572 Guilford in Fitchburg, Wisconsin, to drop off Steve for the evening. May testified that the group went to Armstrong's apartment after dinner and before watching MASH at Kohlhardt's house.

¶ 16. However, Kohlhardt testified that Steve joined them watching MASH at Kohlhardt's house following dinner. Further supporting Kohlhardt's testi-

646

mony was the testimony of Armstrong's neighbor, Patricia Emmerich, who stopped by Armstrong's apartment to meet Steve a few minutes after 9 p.m. and said that Steve, Armstrong, and Kamps were present. Armstrong testified that May was also with them when Emmerich stopped by at 9:00 p.m. but that May was in the bedroom at the time, packing up her things from the previous night's visit.

### 3. 9:00 p.m. onward

¶ 17. It is disputed what occurred between 9:00 p.m. and 10:00 p.m. on the evening of June 23, but trial testimony clearly shows that around 10:00 p.m., Armstrong, May, and Kamps ended up in May's apartment and watched part of the 10:00 p.m. news together while using cocaine. Both May and Armstrong testified that Kamps left May's apartment at about a quarter to 11:00 p.m. and that Armstrong left about 15 minutes later.

¶ 18. A friend of Kamps, Michael Erdenberger, testified at trial that Kamps called him at his apartment at 10:52 p.m. on June 23. Erdenberger said that Kamps was looking for Dillman. He also said that during their two-minute conversation, Kamps did not seem excited.

¶ 19. May spoke with Kamps by telephone at some point between 11:00 p.m. and 11:15 p.m. to discuss plans to go water-skiing the next day. May's phone call was the last time any witness admitted to having contact with Kamps.

¶ 20. Dillman testified that he tried to reach Kamps several times between 2:00 and 2:30 a.m. on June 24 but received a busy signal. Dillman called again between 9:30 and 10:00 a.m. with the same result, and finally called May at about 12:15 p.m. to ask her to stop by Kamps' apartment.

¶ 21. May testified that at about 12:40 p.m., she discovered Kamps' body, noticing that the telephone receiver was off the hook, as if it had been intentionally placed aside. May then ran back to the Pipefitter and had one of her coworkers call the police.

### a. Armstrong's Account of His Whereabouts

¶ 22. Armstrong testified that at about 9:00 p.m., while he, Kamps, and May visited his apartment to drop off his brother, Steve, he telephoned Brent Goodman at 153 Harding Street, Madison, Wisconsin, to inquire about buying more cocaine. Goodman testified that he had sold cocaine to Armstrong earlier that afternoon and corroborated the 9:00 p.m. telephone conversation with Armstrong, in which Armstrong said that he would stop by Goodman's house in a half-hour.

¶ 23. Armstrong testified that he, Kamps, and May left Armstrong's apartment and dropped May off at her apartment. In the parking lot behind May's apartment building, Armstrong said that he and Kamps switched from his to Kamps' vehicle, which was parked in the same lot.

¶ 24. On the way to Goodman's house, Armstrong testified that Kamps invited Armstrong up to her apartment for a beer sometime between 9:15 and 9:25 p.m. Armstrong accepted, and he said he had a half-glass of orange juice and a can of beer. He also testified that he had to move a glass bong off a table so that he could put his drink down, explaining why his fingerprint was found on the bong in Kamps' apartment. Armstrong said he played some music on the stereo and talked with Kamps for a short while before the two continued on to Goodman's.

¶ 25. At Goodman's, Armstrong testified that he and Kamps purchased about 0.4 grams of cocaine and then returned to May's apartment between 10:00 and 10:30 p.m., where Armstrong, May, and Kamps used the cocaine and watched television.

¶ 26. Armstrong testified that Kamps left at about 10:45 p.m., and Armstrong said that he left about 15 minutes later to return to his apartment to visit with his brother. Armstrong stated that after he arrived at his apartment, he made several phone calls, attempting to find a different source for more cocaine, but was unsuccessful. Armstrong said he then tried to phone Kamps to let her know that he was unable to find more cocaine but received a busy signal.

¶ 27. Armstrong said he then drove back to May's apartment and estimated that he arrived at about 1:00 a.m., judging from the bar traffic around State Street. Armstrong testified that when he returned to May's apartment, he entered through the fire escape at the back of the building, not the front staircase. Armstrong explained that he would generally enter the building using the fire escape, because he did not have a key to get through the front door.[4]

¶ 28. May testified that she estimated the time Armstrong returned to her apartment for the evening

[4] Charles Lulling, an investigator for the defense testified that the doors to the fire escape were unlocked.

Terry Fink, a resident in May's apartment building and who lives below May's apartment, testified that she had once used the fire escape when she lost her keys and could not get into the building through the front. However, Fink also testified that shrubs and bushes blocked the path from the alley behind the apartment building to the fire escape and that it is not a path that one would normally choose. Additionally, Fink stated that while she was awake in her apartment between 3:30 a.m. and 5:00 a.m., she heard somebody come up the front stairwell.

was around 1:00 a.m., judging from the noise outside resembling bar time. However, May admitted stating at the John Doe hearing that Armstrong's return could have been as late as 3:00 or 3:30 a.m. Also, May acknowledged that she told two coworkers the next morning that Armstrong was not with her that night, later explaining that it was a false comment, a "flip remark."

### b. The State's Refutation of Armstrong's Whereabouts

¶ 29. The State presented testimony that the distances between May's, Kamps' and Goodman's apartments were too great for Armstrong's version of events to be plausible. Madison Police Detective Theodore Mell testified that he drove the routes between the various apartments at five to ten miles per hour faster than the speed limit and stated that the time between Armstrong's apartment at 5572 Guilford and May's apartment at 519 State Street was ten minutes and 27 seconds. He further testified that the driving time between May's apartment and Goodman's, located at 153 Harding Street, was ten minutes and 22 seconds.

¶ 30. As noted above, Emmerich testified that she visited Armstrong in his apartment a few minutes after 9:00 p.m. Goodman testified that Kamps and Armstrong stopped by at about 9:30 p.m. Goodman did not note the precise time but estimated that Armstrong and Kamps left his home between 9:35 p.m. and 9:45 p.m. Armstrong and Kamps returned to May's apartment at about 10:00 p.m. The State argued that given the driving times, Armstrong could not have visited Kamps' apartment at the time Armstrong stated—around 9:30

p.m.—because Goodman placed Armstrong and Kamps at his house ten minutes away, at the same moment.[5]

¶ 31. To refute Armstrong's story that he returned to May's apartment at about 1:00 a.m., the State presented two residents of May's building who the State argued would have seen or heard Armstrong if he had entered at that hour. Terry Fink testified that the musician Jackson Browne was making a promotional film on State Street, including filming outside the Pipefitter. Fink stated that from five or ten minutes before 1:00 a.m. until 1:45 a.m., she was on the sidewalk within ten feet of the front apartment door, observing the film crew and chatting with friends. Fink testified that she never saw Armstrong in the area or enter the apartments during that time.

¶ 32. Jeff Zuba was the resident manager for the apartments directly above the Pipefitter. Zuba testified he was in his apartment at 9:00 p.m., waiting for the film crew to contact him about turning on the store's lights, and remained in his apartment with the door open throughout the evening. The front door of the apartment building had a security lock but was propped open with a brick that night for the benefit of the film crew. Zuba testified that his apartment door was opposite the door at the top of the front staircase and that he could hear anyone entering or leaving the building.

---

[5] Armstrong argued that the driving times presented by the State were unreasonable, creating an average driving speed of slightly more than 26 miles per hour. If Armstrong had been driving an average of 40 miles per hour, the difference in speed would create enough time for Armstrong's explanation of his visit to Kamps' apartment to become reasonable. Additionally, Goodman was not precise about the time he provided and gave rough estimates of the time Armstrong and Kamps arrived and the duration of their stay.

¶ 33. Zuba stated that between 10:00 and 10:15 p.m., Kamps poked her head in to say hello. Zuba also heard Armstrong's voice in the stairway but did not see him.

¶ 34. Zuba said he went downstairs to the sidewalk in front of the Pipefitter three times that evening to check on the crew's progress, but he claimed he did not wander far from the apartment's entrance. Zuba returned to his apartment for the last time about 12:45 a.m. and kept his apartment door open until he went to bed at about 1:15 a.m. He did not see or hear Armstrong leave or return to the building.

¶ 35. With regard to Armstrong's testimony that he returned to May's apartment at about 1:00 a.m. through the fire escape at the back of the building, Zuba admitted that he would not have heard someone entering or leaving by the back stairway.

¶ 36. A Madison Police Officer, Vivian Beckwith, testified on behalf of the State during rebuttal. She issued a ticket for Armstrong's vehicle shortly before 11:00 a.m. on June 24 for parking in the private lot adjacent to the Pipefitter. The State argued that the ticket was concrete evidence that contradicted Armstrong's testimony that he parked in the lot behind the building that made his entry through the back door much less likely.

## B. Evidence Placing Armstrong at the Murder Scene

### 1. Witnesses

¶ 37. The State presented two witnesses to support its theory that Armstrong went to Kamps' apartment after midnight, instead of before 10:00 p.m., as Armstrong asserted.

### a. Laura Chafee

¶ 38. The first witness was Laura Chafee.[6] She lived at 134 West Gorham in the apartment directly below Kamps' and heard some music, which seemed to be coming from upstairs, starting at about 12:05 a.m. Chafee testified that she had not heard music from Kamps' apartment earlier in the evening. Detectives from the Madison Police Department had Chafee sit in her apartment and listen to music played in Kamps' apartment. Chafee testified that the sound was similar. Josef Rut, a Madison Police Officer, testified that he removed a Grand Funk album from Kamps' stereo. Dillman, Kamps' boyfriend, testified that Armstrong had once played Grand Funk Survival for him. Dillman said that a copy of the album was on Kamps' turntable when he accompanied investigators on a walk-through of her apartment several days after her murder. Judy Marty, who worked at the Pipefitter and was at May's party on June 23, also testified that Armstrong had once told her that Grand Funk Survival was among his favorites and that he played the album for her.[7]

### b. Riccie Orebia

¶ 39. Riccie Orebia was the second witness the State presented to place Armstrong at Kamps' apart-

---

[6] Laura Chafee's recollections were apparently refreshed through hypnosis. However, this was not explored at trial by either the State or by Armstrong.

[7] At trial, Armstrong argued that Grand Funk Survival was a popular album liked and owned by many, including Armstrong, May, and Kamps. As previously noted, Armstrong testified that he visited Kamps' apartment between 9:00 and 10:00 p.m. Armstrong could not remember, however, whether he put a record on her stereo or just turned on her receiver.

ment at the time of the murder.[8] Orebia lived at 120 W. Gorham and sat on his porch from shortly after 10:30 p.m. until almost 4 a.m. on the night of June 23 and during the early morning of June 24. Orebia did not have a watch or clock available, but asked a passer-by for the time and was told it was about 11:45 p.m.

¶ 40. Based on that time, Orebia estimated that at about 12:30 p.m., he saw a white car with a black top pass on West Gorham and described the driver as having dark, shoulder-length hair.[9] Orebia saw the car pass a second time and park out of view across the street.

¶ 41. About five or ten minutes later, Orebia saw a person walk from the direction of the parking lot, cross the street, and enter Kamps' apartment building. Orebia described the person he observed as lean and very muscular.[10] About five to ten minutes after that, the same man left the building and headed back the direction he had come. Orebia testified that another five minutes passed, and the same person crossed the street, entered the building a second time, and then, after staying inside another five minutes, left again this time without wearing a shirt. Orebia stated that five more minutes passed, and the same person ran across the street to the building a third time, stayed for about

---

[8] Riccie Orebia was living as a transvestite at the time of trial and was referred to in the feminine. In the record from the postconviction motion hearing and in the court of appeals opinion, Orebia is identified in the masculine. We will do the same.

[9] Armstrong testified that he bought a black-over-white Plymouth Satellite with the money he borrowed from Dillman.

[10] Greg Kohlhardt, Armstrong's friend, testified that Armstrong was particularly strong and that he had once witnessed Armstrong rip a full deck of cards in half.

20 minutes, and then left running very fast, "shining" as if he were oily. Orebia then observed the black-over-white car speeding away from the parking lot.

¶ 42. Thomas Anderson, another resident in Orebia's building, testified that on the afternoon of June 24, Orebia shared the following description of what he observed the night before: a muscular man with large arms and a flat stomach ran in and out of Kamps' building without a shirt on and that a black-over-white vehicle sped away from the scene.

### i. Orebia's Hypnotically Enhanced Memory

¶ 43. Several days after the murder and prior to any police identification procedure, Orebia underwent hypnosis to enhance his memory.[11] Dr. Roger A. McKinley performed the hypnosis, and Detective Robert Lombardo of the Madison Police Department was present during the process to provide McKinley with information about important areas to cover. McKinley testified that prior to hypnosis, Orebia gave him a description of the man Orebia observed, indicating that he had shoulder-length hair, a muscular build, and that he was running and sweating when he left the scene.

¶ 44. McKinley testified that during the hypnotic session, Orebia described particular features of the suspect's face, including that the suspect had a long nose and bushy eyebrows. McKinley admitted that if Orebia would not have been able to make out the detail of Armstrong's face because of lighting conditions, then

---

[11] In response to Armstrong's attack on Orebia's credibility with regard to his recantations and the effect of hypnosis, the State emphasized that Orebia's early description matched his trial testimony.

any description he gave of Armstrong's nose, eyebrows, and other features would have to be "confabulation."[12]

¶ 45. Photographs of Armstrong and the vehicle were passed between Lombardo and McKinley during the hypnotic session, in front of Orebia. McKinley testified that in his presence Orebia was never shown photographs of Armstrong. However, Lombardo stated that Orebia saw photographs of Armstrong's vehicle when he handed them to McKinley during the session and that Orebia had also seen photos of the car prior to hypnosis. McKinley defended his hypnosis procedure with Orebia as non-suggestive.

¶ 46. At trial, Armstrong was critical of the decision to subject Orebia to hypnosis. Lombardo argued that prior to hypnosis Orebia stated he would have been able to identify the person he had seen.[13]

¶ 47. Armstrong presented the testimony of Dr. John F. Kihlstrom, a psychology professor who testified to the effects of hypnosis on memory. Kihlstrom stated that hypnosis can be used to access memories that are not ordinarily memorable in the wakened state, but the hypnotist also runs an equal risk of confabulation.[14] Kihlstrom stated that precautions to limit the introduction of inadvertent suggestion include keeping the hypnotist blind to the facts of the case, and to conduct

---

[12] Dr. Kihlstrom, Armstrong's hypnosis expert, defined "confabulation" as the creation or alteration of memories through such suggestion that the subject could wake from the hypnotic state and remember something that actually never occurred.

[13] Orebia also testified that he would have been able to make a positive identification without hypnosis and that the suggestion to undergo hypnosis was Lombardo's.

[14] *See* footnote 11 for Armstrong's expert's definition of confabulation.

the session out of the presence of an investigator who could suggest particular views.

¶ 48. During his testimony, Kihlstrom presented excerpts from the videotaped session between McKinley and Orebia. Kihlstrom noted that Lombardo was in the room during the session, and that Orebia initially described the suspect as being five-feet, three inches to five-feet five-inches tall, but McKinley suggestively inquired about a height of six feet tall until Orebia agreed with that height. Armstrong's attorney stated that Armstrong is six-feet, two inches tall.

### ii. Orebia's Line-up Identification of Armstrong

¶ 49. In the early morning hours of July 1, 1980, after Orebia had undergone hypnosis, the Madison Police Department arranged a line-up procedure at 134 West Gorham. Armstrong's attorney at the time, Dennis Burke, instructed Armstrong not to cooperate and Armstrong complied with Burke's direction. The police then returned Armstrong to jail.[15] The line-up was rescheduled and held in the early morning hours of July 3, 1980. Again, Burke had instructed Armstrong not to cooperate. Detective Francis McCoy testified that at about 4:00 a.m. on July 3, he requested that Armstrong put on a shirt, a pair of jeans and a pair of cowboy boots to match the other line-up participants, but Armstrong refused.

¶ 50. At the line up, two police officers walked with each of the five line-up participants across West Gorham, up to the porch of Kamps' apartment at 134 West Gorham, and then back the opposite direction.

---

[15] Armstrong was previously arrested in connection with Kamps' murder.

Armstrong was the second person to go and he went limp as soon as he and the two officers accompanying him came into view of the observers standing on the porch of 120 West Gorham. Detective Roger Attoe and a patrolman accompanied Armstrong and dragged him up to the porch of Kamps' apartment and back again. Detective Attoe testified that Armstrong lost his shoes along the way and made the statement, "better a little pain now than life imprisonment later." The police took the three remaining participants along the same route.

¶ 51. The five line-up participants were then each held by two police officers in front of a police van and Orebia was brought down to the parking lot to observe. Orebia walked down to view the participants at a distance of about 25 feet. The testimony of the State's witness, Detective McCoy, and the defense's witness, Attorney Burke, differ as to whether Armstrong was slumping or standing at full height at the time Orebia viewed the line-up in front of the van.

¶ 52. At trial, Orebia testified that upon seeing Armstrong's head come into view during the first portion of the line-up, he gasped and mentioned to police officers standing with him that Armstrong was the person he saw leaving the murder scene.

¶ 53. Orebia also stated that he recognized that the other line-up participants, including the first participant, were wearing shoulder-length wigs and mentioned that observation to the officers standing with him. Orebia testified that the police told him that they had a man in custody who would be in the line-up, however, the police also instructed Orebia not to pick anyone unless he was sure. Orebia admitted to telling Attorney Burke that as far as he was concerned, the line-up was fixed.

### iii. Orebia's Ability to Make Observations.

¶ 54. Armstrong presented Dr. John Fournier, an ophthalmologist, to refute the ability of Orebia to make certain observations. Fournier measured the distances and lighting conditions from Orebia's vantage point on the porch of 120 West Gorham to the route of the person he observed. Fournier testified that night vision acuity is about $1/10$ that of daytime vision, and that given the conditions under which Orebia made his observations—a distance of 100 to 134 feet and low illumination from the street lamps with glare in the foreground—it was not physically possible for a person in Orebia's position to make out facial features.

### iv. Orebia's Recantation

¶ 55. On November 5, 1980, Orebia gave a statement under oath at Armstrong's attorney's office (Attorney Edward Krueger), in the presence of a court reporter and Armstrong's attorney's investigator, Charles Lulling, in which Orebia directly contradicted his identification of Armstrong to the police. In that statement, Orebia said that Armstrong absolutely could not have been the person he saw running in and out of 134 West Gorham.

¶ 56. Orebia gave a second statement in Attorney Krueger's office on November 10, 1980, indicating that he had read through the statement he had given five days prior and that it was true and correct.

¶ 57. However, at trial Orebia recanted his recantation and stated that he was positive that Armstrong was the person he saw enter and leave Kamps' apartment building three times on the night of June 24, 1980. Orebia testified that the statements he gave on November 5 and 10, 1980, were purposely untruthful,

659

told as deliberate lies to undermine his credibility as a witness and to hopefully result in his withdrawal as a witness.

### 2. Missing Money from Kamps' Apartment

¶ 58. The State also theorized that after Armstrong murdered Kamps, he stole the $400 from Kamps that he had given her earlier in the evening. In the early afternoon of June 24, 1980, the State established that Armstrong deposited $315 in cash into his bank account. In both the opening and closing statements, the State emphasized the $400 missing from Kamps' apartment and Armstrong's $315 cash deposit the following afternoon, asserting that both instances together were an indication of Armstrong's guilt.

¶ 59. Karen Renzaglia, a bank teller at First Wisconsin West Towne Bank, was familiar with Armstrong and testified on behalf of the State. She said that Armstrong did not usually deposit large bills or large amounts, but on June 24, 1980, he gave her at least one $100 bill and at least two $50 bills, along with five 20s, a ten and a five, and then a check. While Armstrong was typically talkative, he was quiet that afternoon.[16]

¶ 60. The State presented testimony from several detectives that investigators were unable to find the $400 in cash that Armstrong gave to Kamps to partially satisfy his debt to Kamps' boyfriend, Dillman. Dean Fisher, a uniformed special investigator with the Madison Police Department testified that he and another officer looked in "just about any conceivable place we figured there would be money hidden. Drawers, dress-

---

[16] Armstrong explained that if he was any less talkative in the drive-through, it was because he was chatting with his brother sitting in the passenger seat. Renzaglia testified that she could not be sure if Armstrong was alone in the vehicle.

ers, cabinets, anything," including clothing, in Kamps' apartment without finding the $400.

¶ 61. James Meicher, a member of the Dane County Sheriff's Department, assisted Fisher with the scene. Meicher testified that he found $136 in a pair of blue jeans that was located halfway from the top of a fairly large pile of clothing in Kamps' apartment, stating that the denominations were six $20 bills, three five dollar bills, and a single one dollar bill. Dillman testified that on the morning of June 23, 1980, when Kamps left his home in McGregor, Iowa, he gave her $133 in cash—six 20's, a ten, and three ones. The State attributed the $136 found in Kamps' apartment to Dillman and argued that the $400 investigators could not locate could be found in Armstrong's bank account and in the $61 on his person when he was taken into custody.

¶ 62. Armstrong testified that his brother, Steve, gave him $300, in repayment for clothes Armstrong bought him and for Steve's summer rent.[17] At trial, Armstrong also explained that he was involved in a car accident in the middle of May and received an insurance check on June 20 for $600 from his insurance company. He also sold the salvaged car to his roommate for another $250. May testified at the John Doe hearing

[17] The State presented evidence to refute whether Steve had $300 to give to Armstrong. On June 23, Armstrong spent $140 on clothes for Steve, who had lost his luggage on the bus ride to Madison. Armstrong also admitted that several weeks before Steve arrived, Steve had asked Armstrong to send money to cover his travel costs.

Additionally, with regard to Armstrong's other sources of money, Brent Goodman testified that Armstrong had to borrow cash from Kamps to purchase cocaine from Goodman on the night of June 23, as Goodman heard Armstrong tell Kamps he was a little short.

that she was with Armstrong when he cashed the insurance check and that she witnessed Armstrong receive large bills.

### 3. Physical Evidence at the Crime Scene

¶ 63. The police collected hair specimens and semen samples from Kamps' apartment, as well as two fingerprints that were found on a bong. The police also gathered what purported to be blood evidence from underneath Armstrong's fingernails and toenails. The State argued to the jury that the physical evidence "conclusively" and "irrevocably" established Armstrong as the killer.

#### a. Fingerprints

¶ 64. Josef Rut, a Madison Police Officer, testified that one of the two fingerprints on the bong matched Armstrong and that the source of the other print was unknown.

#### b. Semen Stains on the Robe

¶ 65. Coila J. Wegner, a microanalyst at the State Crime Laboratory Bureau, tested semen samples found on the bathrobe recovered from the floor next to Kamps' body. Wegner testified that she found nine areas on the robe that tested positive for the presence of seminal material. She tested the stain nearest the hem of the robe and determined that it was indicative of a type A secretor. Wegner testified that both Armstrong and Dillman are type A secretors, as are 80 percent of the world's population.

¶ 66. On cross-examination, Wegner testified that the location of at least seven of the nine seminal stains on the robe were consistent with a person having sexual

intercourse and then sitting down while wearing the robe. Wegner stated that these stains would remain on the robe until the garment was washed. Dillman testified that Kamps' wore the robe often, usually in the morning before she got dressed and when she retired in the evening.

¶ 67. The State argued the following about the semen evidence in closing argument:

> This picture shows Charise Kamps' robe. (Indicating.) It's right next to the bed. You heard testimony about that robe. Jill Wegner performed tests on it and she looked for seminal material and she found it. Found spots of it. She did an analysis on that. She was trying to determine the blood type of the person who put seminal fluids on the robe. So, she analyzed it and found that it came from a person with type A blood who secreted his blood type in his body fluid, in his semen, in his saliva, in his tears. And she analyzed Ralph Armstrong's blood and his saliva. Ralph Armstrong's a type A secreter.

### c. Blood Evidence - Hemosticks

¶ 68. Armstrong drove to the police station at about 2:15 p.m. on the afternoon of June 24 to wait for May, who was asked to give a statement to police. After arriving at the station, Armstrong was asked by Officer Hathoway to give a statement. After three interviews, at about 8:30 p.m., Armstrong signed consent forms for searches of his person, car, and apartment. Wegner took samples from Armstrong, including a standard head hair, pubic hair, a saliva sample, and tested Armstrong's hands and feet for traces of blood.

¶ 69. Wegner testified that after running hemosticks—plastic strips with treated absorbent pads that react to the presence of certain proteins found in blood—under the nails of Armstrong's fingers and toes

and around the cuticles, she found a presumptive positive reaction on every finger and on several toes.[18]

¶ 70. Wegner then scraped material from underneath Armstrong's thumbs and large toes, tested the samples, and determined that the material indicated blood of human origin. However, Wegner testified that she did not have sufficient material to run additional tests and could not identify from whom the blood came or how old it was. In fact, Wegner agreed that in her experience, she had blood over one-year old produce positive hemostick results.

¶ 71. Wegner agreed that the sensitivity of the hemosticks is one in 300,000 to trigger a presumptive positive. She also agreed that the hemosticks simply react to particular chemicals within blood—iron, and plant peroxide—which are also found in other substances besides blood.

¶ 72. Armstrong presented evidence supporting alternative explanations for the presence of human blood under his thumbnails and large toenails. During the tests in the evening of June 24, 1980, in the presence of Detectives Roger Attoe and Rudolf Jergovic, and at trial, Armstrong stated that he had fallen and scraped his elbow and his knee the previous day in a footrace with his brother in the Arboretum. Armstrong also explained that in the days preceding the tests he had sex and had taken showers with his fiancée, May, while she was experiencing her menstrual period and that she tended to bleed profusely.

¶ 73. Indeed, Wegner testified that Armstrong showed her the scab on his knee when she conducted the tests, and Armstrong presented photographs of his

---

[18] Wegner also used hemosticks on Armstrong's watch, finding a presumptive positive for blood, but did not have sufficient amounts to determine the blood's origin.

scrapes in a trial exhibit. Wegner's testing also found blood on the inside of Armstrong's pants that was consistent with his scraped knee. No other traces of blood were found on Armstrong's clothing or inside or outside of his boots.

¶ 74. May's testimony corroborated Armstrong's explanation about his fall during the footrace and about Armstrong's and May's physical intimacy during her menstrual period. May specifically stated that she sought medical attention regarding her particularly heavy bleeding in the days prior to Kamps' murder. May testified that she was bleeding heavily during a shower with Armstrong and that she later had surgery to correct her condition.

¶ 75. Wegner also testified that she spent two full working days examining the interior of Armstrong's car for traces of blood. Wegner tested for blood in the car's interior, including the trunk compartment, and focused on the steering wheel, gearshift lever, lock button on the driver's door, the floor, ceiling, and the front and rear seats. Wegner found no traces of blood anywhere within the vehicle and testified that it did not appear as if there had been an attempt to clean the car.

¶ 76. The State characterized Wegner's findings of trace amounts of blood underneath Armstrong's fingers and toenails in closing with the following:

> The defendant's fingers were tested down at the police station. Jill Wegner ran the hemosticks around the cuticles and under the thumb and under the nails and around the cuticles of every finger and lo and behold there was blood under every fingernail, every single one. *That was Charise Kamps' blood.* (Emphasis added.)

### d. Hair Evidence

¶ 77. Wegner assisted Dr. Huntington with his postmortem examination of Kamps' body. Wegner re-

665

covered pubic hair combings and head and pubic hair standards from Kamps for comparison.

¶ 78. A number of hairs were recovered from Kamps' apartment, which Wegner compared to the standard head and pubic hairs from Armstrong, Kamps, and Dillman. At trial, Wegner explained her process of comparison to the jury, elaborating on the characteristics of importance—the scales on the hair's surface, or cuticle; the form, color, and distribution of pigmentation; the consistency of the center, or medulla, of the hair; whether the hair has been shed, broken, or forcibly removed; any unusual characteristics, such as double medulla or cracked cuticles; and physical condition of the hair.

¶ 79. Wegner testified that there are 60 to 70 characteristics she compares between hairs to determine whether two are "similar" or "consistent." Only a majority is needed to determine two hairs are "consistent." Wegner stated that in almost all instances—99.9 percent—one could not say through microscopic analysis that a specific hair came from a specific individual. Wegner testified that hair analysis can include or exclude a person but could not identify them.

¶ 80. Wegner testified that two head hairs and one pubic hair were removed from the bathrobe belt that was draped across Kamps' body. One head hair was consistent and one was similar with Armstrong's hair. The pubic hair removed from the belt was consistent with Kamps.

¶ 81. From Kamps' bathroom sink, investigators recovered two head hairs and two head hair fragments. Wegner testified that one head hair was similar with Kamps, two were consistent with Armstrong, and one could not be attributed to either Kamps or Armstrong. Armstrong's counsel elicited testimony from May that

May, Kamps, and Armstrong routinely shared the same hairbrushes, and May identified a hairbrush in the photograph of Kamps' bathroom counter as one of May's own.

¶ 82. Wegner analyzed 13 hairs from blood and fecal-like matter collected at the scene, including five head hairs, four pubic hairs, three body hairs, and one animal hair. Of those, Wegner found one head hair that was consistent with Armstrong's. All four of the pubic hairs were consistent with Kamps.

¶ 83. From the fan in Kamps' apartment, investigators recovered four head hairs, one of which was similar to Armstrong's, and three were consistent with Kamps. Wegner attributed one head hair recovered from Kamps' apartment to Dillman.

¶ 84. From the robe itself, Wegner collected one head hair, which was consistent with Kamps, and three pubic hairs. Two of the pubic hairs removed from the robe were consistent with Kamps, and one was not consistent with either Kamps or Armstrong.

¶ 85. On the bedspread from Kamps apartment, Wegner found one head hair and nine pubic hairs. Five pubic hairs were consistent with Kamps, and four pubic hairs, which had been "forcibly removed,"[19] were inconsistent with both Kamps and Armstrong.

¶ 86. Of the hairs collected in the vacuum sweeping around the bed,[20] none were found to be consistent with Armstrong. Ten pubic hairs, five of which were

---

[19] Wegner testified that one could determine whether a hair had been cut, shed, broken, or forcibly removed, based on the condition of the hair and presence or lack of a follicle.

[20] Wegner testified that seven head hairs, six head hair fragments, 20 pubic hairs, two pubic hair fragments, seven animal hairs, and three body hairs were recovered from the vacuum sweeper.

forcibly removed, in the vacuum sweepings were not attributable to either Kamps or Armstrong.

¶ 87. Wegner agreed that in about half of all sexual assault cases pubic hair is transferred from the assailant to the victim or from the victim to the assailant. Wegner stated that no pubic hairs collected from Kamps' apartment were determined to be consistent with Armstrong, and no hairs were found on Armstrong, or on articles seized in the search of Armstrong's apartment, that were consistent with Kamps.

¶ 88. In closing arguments, the State argued that the two head hairs found on the bathrobe belt draped across Kamps' body (one of which Wegner determined to be consistent with and the other to be similar to Armstrong's hair), the two head hairs found in the sink (which were consistent with Armstrong's hair), the head hair found in the fan (which was similar to Armstrong's hair), and the head hair found in the fecal matter near Kamps' body (which was consistent with Armstrong's hair) proved that Armstrong murdered Kamps. The State made the following statements characterizing the hair evidence:

> Now, you have an opportunity to see what that scene looked like right after Ralph Armstrong committed the murder (indicating).[21] That's what they saw on the bed (indicating). Charise Kamps. That was Charise

---

[21] The indications the State made were to crime scene photographs depicting Kamps' body "nude, lying on her face, with blood smeared on her back, buttocks and thighs." *State v. Armstrong,* 110 Wis. 2d 555, 579, 329 N.W.2d 386 (1983). These are the same photographs this court concluded in Armstrong's direct appeal were properly sent back to the jury room to aid the jury in its assessment of the physical evidence produced at trial. *Id.* This court stated, "We conclude that the trial judge could

Kamps. I want you to look at the smear marks on the legs. You can't see it real well from this angle (indicating). You have heard Officer Fisher describe it. You heard Jane May describe it. It says it was like finger paints (indicating).[22] So, Charise Kamps was found lying in blood and feces and on her bed with that robe on. This is it (indicating) lying on top of Charise Kamps' body. *Two of the defendant's hairs were on this robe.* One of Charise Kamps' hairs right there across the body (indicating).

. . . .

They looked for hairs. Where did they find the hair in that apartment? Found it in the bathroom sink. Found it in, on the robe tie. Found it in the fan, and they found it in a pile of feces on the floor underneath the body. The defendant's hair in every place in that apartment was consistent with his killing Charise Kamps.

The cabinet in the bathroom was open. Right where the towels were kept were open. The defendant had gone in there to clean up after he murdered Charise and his hair was in that sink.[23]

The defendant would want you to believe that hair kind of floats around and lands where it was and has a mind of its own. There is no explanation for why that

reasonably decide that the photograph in question could assist the jury in their assessment of the physical evidence connecting the defendant to the crime and that the purpose was not merely to inflame or prejudice the jury." *Id.*

[22] As noted, there was no indication the killer cleaned himself or herself at Kamps' apartment. Further, Wegner found no traces of blood in Armstrong's car.

[23] As noted above, the police found no indication, and there was no evidence to establish, that the killer cleaned himself or herself at Kamps' apartment following the murder.

hair was found in every place that the defendant was except that he murdered Charise Kamps. (Emphasis added.)

¶ 89. In closing, Armstrong disputed the State's characterization of hair evidence at length. Specifically, Armstrong argued that the sharing of hairbrushes among Kamps, May, and Armstrong provided an innocent explanation for why Armstrong's hair was found in Kamps' bathroom sink. Armstrong noted that many forcibly removed pubic hairs were found at the scene, all of which were inconsistent with Armstrong's hair, and asserted that the hairs belong to the person who killed Kamps.

¶ 90. The jury convicted Armstrong on all counts.

## C. Procedural History and Newly Discovered Evidence.

¶ 91. After the convictions, Armstrong filed a postconviction motion that requested a new trial, arguing: (1) Orebia's identification of Armstrong should have been inadmissible because of the State's use of hypnosis to enhance his memory; (2) the line-up identification of Armstrong was unreliable and was therefore inadmissible; (3) the trial court erroneously exercised its discretion by allowing two color murder scene photographs of Kamps' to be sent to the jury room; and (4) the State breached its duty to disclose exculpatory evidence by failing to provide an accurate copy of a parking ticket received by the defendant. *See State v. Armstrong*, 110 Wis. 2d 555, 559–60, 329 N.W.2d 386 (1983). This court affirmed. The Seventh Circuit Court of Appeals later denied Armstrong's petition for a writ of habeas corpus. *Armstrong v. Young*, 34 F.3d 421 (7th Cir. 1994).

¶ 92. On February 26, 1991, Armstrong moved for a new trial based on newly discovered evidence, specifically DNA evidence that excluded him as the source of semen on Kamps' robe. The circuit court for Dane County, Honorable Michael B. Torphy, Jr., denied the motion, concluding that this evidence would not probably produce a different result on retrial. *See State v. Armstrong,* No. 1992AP232–CR, unpublished slip op. at 2 (Wis. Ct. App. June 17, 1993). The court of appeals affirmed. *Id.* at 1.

¶ 93. The court of appeals determined that the semen evidence was "an insignificant piece of circumstantial evidence linking Armstrong to Kamps and to her apartment." *Id.* at 2. Further, the court of appeals stated:

> Of much greater importance to the state's case was the unshaken testimony of Kamps' neighbor who saw Armstrong acting strangely while going in and out of Kamps' apartment building during the hours when the crime occurred. Armstrong attempted to present an alibi for that time that the state effectively demolished. Other physical evidence, such as blood and hair samples found on his body and at the crime scene, also inculpated Armstrong. Additionally, the day after the murder Armstrong made an unusually large deposit of $315 in cash in his bank account. Kamps was known to have had $400 in her apartment the previous day that was never found. Armstrong was aware of the cash because it was he who had paid it to her to satisfy a debt. This evidence would likely produce a guilty verdict on retrial even with Armstrong's conclusive proof that he did not leave his semen in Kamps' apartment.

*Id.* at 3.

¶ 94. On May 17, 2001, Armstrong filed another motion for a new trial based on newly discovered evidence. This motion was based on three findings, which the State did not dispute.

¶ 95. First, DNA testing conducted by Dr. Edward Blake excluded Armstrong, as well as Kamps' boyfriend, Dillman, as the source of the two hairs found on the robe belt. As noted above, at trial, the State's forensic expert testified that using microscopic analysis, she concluded that one hair was "similar" and one "consistent" with Armstrong's hair. Second, Blake found no traces of blood when examining a piece of cloth accompanying slides allegedly prepared from the hemostick swabs and scrapings from Armstrong's thumbs and large toes. Third, Armstrong reasserted that the DNA analysis conducted in 1990 excluded Armstrong as the source of the semen on the Kamps' bathrobe.

¶ 96. The only issue was whether this new evidence created a reasonable probability that the result would be different at a trial. Armstrong claimed that it did, while the State contended:

> [O]ne of the things you do, when you analyze that is, what was the strength of the scientific evidence that we presented?
>
> Frankly—and you alluded to this earlier—[Armstrong's counsel] did a superb job of cross-examining Miss Wegner in deflating the significance of this evidence.
>
> He brought out the fact that 80 percent of the population is secretors. It was clear, by the time she was done testifying, that the boyfriend or the defendant could have been contributors of the semen, but we didn't know—we couldn't say precisely who.
>
> He cross-examined her and elicited that there were,

I think, 54 pubic hairs on the bed spread forcibly extracted of unknown origin.

I believe that there were 50 not consistent with either the victim or the defendant. Five in the vacuum sweepings around the bed with the same characteristics. One on the bathrobe itself.

There was a bevy of hair that was testified to that would not have included either the defendant or the victim, but was attributable to no one that we knew of at that point.

And [Armstrong's counsel] argued very effectively that the hair evidence was not that significant.

. . . .

. . . He talked about hair goes everywhere. He introduced evidence concerning the sharing of hairbrushes between Charise Kamps, Jane May, who was the defendant's girlfriend, and the defendant. I think two of those hairbrushes were at the scene.

And, beyond, which we have the defendant's admission, that he was in the apartment on the night of the murder.

So the fact that there's hair there, that is seen as consistent with the defendant, is no surprise.

Now I think the Court correctly pointed out that the defendant's contention that these hairs are now— that Miss Wegner's testimony, that the hairs were "consistent with" or "similar to" the defendant's, does not fall—it's clear that to the extent somebody wants you to draw the inference that those hairs are the defendant's, that you can't draw that inference anymore, but she stated what was known to her at the time, and there's no indication, that in fact, in the kind of characteristics she was looking at, that these hairs

aren't "consistent" or "similar to" the defendant's. They simply aren't the defendant's.

¶ 97. In response, Armstrong argued the following:

[Y]ou don't even need a crime scene expert to see, as the Court has already indicated, from your preface here, the critical importance of this; because it is the belt, that there's a good chance was the instrument of death, but beyond that, it's right over the body where the killer had to have been during the course of the murder, and the hairs are on top of it, and I can't think of a forensic expert, a crime scene expert, who would be the appropriate expert in this case, who wouldn't say that that was extremely probative, highly probative. That it was deposited at or around the time of the murder.

It's common sense. It's what they would say, because it's in accord with the usual transfer of principles and, indeed, you know, who said that to the jury? [The prosecuting attorney.] He didn't just say indicative of guilt, as he said in his argument; he said conclusive, irrevocable, and he said it persuasively, notwithstanding our praise of our colleague, [Armstrong's trial counsel,] for pointing out there's an 80 percent chance the serology could have meant somebody else. That wasn't it.

What's important here? The fact, very fact that you're isolating on, and that is these are very, very probative pieces of evidence. The hairs right on top of the belt, right over the crime scene, with the semen below.

A juror looking at this evidence, reasonably listening to what [the prosecuting attorney] said, what the rebuttal was, about timing and explanations for all these different kind of things, and Orebia's opportunity

674

to observe, and everything else, what do people ordinarily do in a common sense way?

They say show me the physical evidence that's most highly probative, that we can use one way or another to corroborate, and what the State said here, in very forceful terms, it's conclusive, it's irrevocable, the hair is there, obviously that's hair, and that there's a high likelihood, extraordinarily high likelihood left by the killer, because of where it's found, and the semen below, that obviously could not be demonstrated at the trial conclusively didn't come from Armstrong.

Both the hair and the semen, it's not going to be a question of opinion; it's a question of fact. They are not from Ralph Armstrong.

That was something that this jury, I'm sure, would rely on when they considered everything, as the tipping point, because it is so highly probative. It is so critical to who committed this crime.

¶ 98. The circuit court for Dane County, Honorable Patrick J. Fiedler, denied Armstrong's motion. Regarding the hemostick tests and how they did not show the presence of any blood, the circuit court found that Wegner's analysis expended all of the blood found. The court further concluded that Wegner's testimony regarding finding blood underneath Armstrong's nails was proper.

¶ 99. Regarding the semen, the circuit court determined that this evidence was minor. Moreover, the court observed that Armstrong established that 80 percent of the population are Type A secretors and that there was no way of knowing when the semen stains were placed on the robe. Thus, the circuit court concluded, the jury was well-apprised of the weight to be given to the evidence.

675

¶ 100. With regard to the hair evidence, the court acknowledged that the bulk of the scientific evidence concerned the hair analysis. However, the new hair DNA tests did not sufficiently tip the scale in Armstrong's favor, the circuit court concluded. The court was persuaded by the fact that the evidence was properly admitted given the science of the times and that the State made a fair presentation of the evidence in its opening and closing arguments. Also, viewing the entirety of the State's presentation of its closing argument, the court concluded the hair evidence played but a small role in the State's case. If the case were to be retried, the circuit court posited:

> I am satisfied the jury would also hear that it is impossible to ascertain with any precision when the hairs found their way on the belt. That this would be consistent with other hairs, to which we cannot give ownership to, that are found in the apartment, including that of an animal, and that with the advancement in science over the course of the last 20 years, while it may be that the hair analysis would certainly be different, I am satisfied, given the way that it would be dealt with in its entirety, that the result would remain the same.

¶ 101. The court said that the most critical evidence was the time-distance testimony as it related to Armstrong's whereabouts. Thus, the court concluded that Armstrong did not meet his burden of clear and convincing evidence that the newly discovered evidence created a reasonable probability that the outcome would be different on retrial.

¶ 102. Armstrong appealed, and the court of appeals affirmed. The court of appeals first determined that judicial estoppel did not lie against the State. *Armstrong,* Nos. 2001AP2789–CR and 2002AP2979–CR,

unpublished slip op., ¶ 31. Armstrong noted that at his trial in 1981, the State argued that the semen and hairs found on the victim's bathrobe unmistakably implicated Armstrong as the murderer. *Id.*, ¶ 30. In light of the new DNA tests, the State now argued that neither the semen nor hair was connected to the murder and that innocuous reasons explain why that physical evidence was present. *Id.* Armstrong claimed the State should be judicially estopped from making this turnabout. *Id.* The court of appeals disagreed, concluding that because Armstrong was asserting newly discovered evidence, the facts could not be the same. *Id.*, ¶ 31. Therefore, the court of appeals reasoned, judicial estoppel did not lie against the State. *Id.*

¶ 103. The court of appeals next turned to Armstrong's newly discovered DNA tests. *Id.*, ¶¶ 32–34. Initially, the court of appeals had to decide whether the newly discovered evidence test applied. *Id.*, ¶ 32. Armstrong proposed that it did not and that a harmless error test did. *Id.*, ¶ 33. Rather than seeking to add new and relevant evidence to the fold, Armstrong sought to remove a powerful inference of guilt from the hair and semen that is now known to be utterly irrelevant to establishing his guilt. *See id.* As it was now known that the evidence was erroneously introduced and used, Armstrong argued the State bore the burden of proving the error was harmless. *Id.*

¶ 104. The court of appeals concluded that the newly discovered evidence test was proper, but wrestled with this conclusion, writing:

> Which test we use is of potential significance. This is an extremely close case. It is not possible to tell from this record whether Armstrong is innocent or guilty. While we affirm the trial court's decision to use the newly discovered evidence test, the use of a harmless-

error test would probably result in our reversing the trial court's order. We agree with Armstrong's argument that innovations in science cast doubt on evidence admitted at trial. These advancements in technology, however, do not render the trial court's evidentiary rulings erroneous at the time they were made. "A motion for a new trial based on newly-discovered evidence does not claim that there were errors in the conduct of the trial or deficiency in trial counsel's performance." [*State v. Brunton*, 203 Wis. 2d 195, 206–07, 552 N.W.2d 452 (Ct. App. 1996).] The distinction Armstrong makes between newly discovered evidence not presented to the jury and evidence later shown to be false is a rational distinction. Additional evidence is conceptually different from evidence from which the State argued false conclusions. But this distinction has not been recognized and we cannot escape the undisputed fact that Armstrong's DNA evidence is newly discovered. It may be anomalous that we use a more strict test where the State benefits from false factual conclusions than where the State benefits from an erroneous evidentiary ruling. But the test for newly discovered evidence is the test the supreme court and this court continue to use.

*Id.*, ¶ 34.

¶ 105. The State disputed only whether Armstrong had "clearly and convincingly" proven that the new " 'evidence create[s] a reasonable probability that the outcome would be different on retrial.' " *Id.*, ¶ 36 (quoting *State v. Avery*, 213 Wis. 2d 228, 234, 570 N.W.2d 573 (Ct. App. 1997)). The court of appeals observed that *Avery* determined that " '[i]f there is a reasonable probability that a jury would harbor a reasonable doubt as to guilt, it follows that there exists a reasonable probability of a different result.' " *Id.* (quoting *Avery*, 213 Wis. 2d at 241). The court of appeals determined that "[its] job is not to determine

how, if at all, the false evidence influenced the jury in the first trial." *Id.,* ¶ 37. Instead, the proper inquiry, the court of appeals stated, "is whether a hypothetical, future jury at retrial would find Armstrong not guilty based on the totality of the evidence, including the new evidence obtained from advances in DNA testing." *Id.*

¶ 106. After reviewing the record, the court concluded that "[d]espite the closeness of this case, Armstrong has not persuaded us that the newly discovered evidence would reasonably cause a new jury to discredit the incriminating circumstantial evidence." *Id.,* ¶ 44. Although "it is easily possible that a new jury could reach a different verdict," *id.,* the court of appeals held that "Armstrong has not shown that the newly discovered evidence clearly and convincingly creates a reasonable probability that the outcome would be different on retrial." *Id.,* ¶ 44.

¶ 107. Finally, the court of appeals questioned whether it had the authority to grant a new trial in the interests of justice because the case was not on direct appeal, but it decided that even if it had the power, it would decline to exercise it. *Id.,* ¶¶ 4, 46–47. The court of appeals distinguished *State v. Hicks,* 202 Wis. 2d 150, 153, 549 N.W.2d 435 (1996), where this court concluded that the real controversy of identification was not fully tried when "the State used the hair evidence assertively and repetitively as affirmative proof of Hicks' guilt" and when later DNA tests excluded Hicks as the donor of the hair. *Id.* at 48. The court of appeals stated:

> Here, the sole issue of the case was whether Armstrong murdered Kamps. The jury considered eye witness testimony, along with other circumstantial evidence, and found that Armstrong murdered Kamps. The misleading hair and semen evidence did not "so cloud" or distract the jury from deliberating this issue.

Likewise, the DNA evidence excluding Dillman [the victim's boyfriend] as the source of the hair and semen is not important enough testimony bearing on the controversy to warrant a new trial. We conclude that the real controversy was tried fully.

*Id.,* ¶ 50.

¶ 108. Armstrong seeks review.

## II

■

¶ 109. Armstrong raises multiple arguments as to why this court should reverse, one of which is that we should use our discretionary reversal power. Armstrong requests that this court order a new trial in the interest of justice because the real controversy has not been fully tried. We agree with Armstrong that the physical evidence now known to exclude Armstrong as the donor was used in a manner such that we cannot say with any degree of certainty that the real controversy has been fully tried.

## A

¶ 110. At the outset, the State, citing *State v. Allen,* 159 Wis. 2d 53, 464 N.W.2d 426 (Ct. App. 1990), disputes whether this court can order a new trial in the interests of justice, as Armstrong's current appeal is not a direct appeal, but rather is premised on an order denying him relief under Wis. Stat. § 974.06 (2001–02). We conclude that even if *Allen* is correct, we have the inherent authority to order a new trial, even where a defendant's appeal is not direct.

¶ 111. In *Allen,* 159 Wis. 2d at 55–56, the court of appeals concluded that it did not have statutory authority under Wis. Stat. § 752.35 (1989–90) to discretion-

arily reverse Allen's judgment of conviction because Allen's appeal was from an order denying him relief under Wis. Stat. § 974.06 (1989–90).[24] There, in a § 974.06 motion, Allen contended that he was denied due process because the jury instructions improperly shifted the burden of proof to him. *Id.* He conceded that he had not raised a contemporaneous objection at the jury instruction conference and thus lost the right to appellate review. *Id.* However, he asked the court of appeals to exercise its discretionary reversal power under Wis. Stat. § 752.35 and reverse his judgment of conviction. *Id.* at 55–56.

¶ 112. The court of appeals rejected Allen's request. The court of appeals cited to its statutory power of discretionary reversal, which provided it "may reverse the judgment or order appealed from, . . . and may direct the entry of the proper judgment or remit the case to the trial court for entry of the proper judgment or for a new trial . . . ." *Id.* at 55 n.2 (quoting Wis. Stat. § 752.35 (1989–90)). However, the court of appeals

---

[24] The court of appeals noted that its statutory discretionary reversal power stated:

> In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, *the court may reverse the judgment or order appealed from,* regardless of whether the proper motion or objection appears in the record and *may direct the entry of the proper judgment or remit the case to the trial court for entry of the proper judgment or for a new trial,* and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

*State v. Allen,* 159 Wis. 2d 53, 55 n.2, 464 N.W.2d 426 (Ct. App. 1990) (quoting Wis. Stat. § 752.35 (1979)) (emphasis added by court of appeals).

stated that "[w]hen an appeal is taken from an unsuccessful collateral attack under [§ 974.06, Stats. (1989–90)] against a judgment or order, that judgment or order is not before us." *Id.* at 55. Instead, "[a]ll that is before us is an order which refuses to vacate and set the judgment of conviction aside or to grant a new trial or to correct a sentence." *Id.* at 55–56. Thus, the court of appeals concluded that its statutory discretionary reversal power did not permit it "to go behind a [§ 974.06] order to reach the judgment of conviction." *Id.* at 56.

■

¶ 113. While the court of appeals' and this court's discretionary reversal powers are coterminous, *Vollmer v. Luety,* 156 Wis. 2d 1, 18, 456 N.W.2d 797 (1990), we need not decide whether our statutory power is constrained according to *Allen* because this court has "both inherent power and express statutory authority to reverse a judgment of conviction and remit a case for a new trial in the interest of justice, even where the circuit court has exercised its power to order or to deny a new trial."[25] *Hicks,* 202 Wis. 2d at 159; *State v. Penigar,* 139 Wis. 2d 569, 577, 408 N.W.2d 28 (1987);

---

[25] *Allen's* exceedingly narrow view of the broad grant of power of discretionary reversal is strange. This court's statutory discretionary reversal power states:

> In an appeal in the supreme court, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, *the court may reverse the judgment or order appealed from,* regardless of whether the proper motion or objection appears in the record, *and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial,* and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, *as are necessary to accomplish the ends of justice.*

*Stivarius v. DiVall*, 121 Wis. 2d 145, 153, 358 N.W.2d 530 (1984); *State v. McConnohie*, 113 Wis. 2d 362, 369–70, 334 N.W.2d 903 (1983).

¶ 114. Under both our inherent powers and our statutory authority, "This court approaches a request for a new trial with great caution. We are reluctant to grant a new trial in the interest of justice, and thus we exercise our discretion only in exceptional cases." *Morden v. Continental AG*, 2000 WI 51, ¶ 87, 235 Wis.

Wis. Stat. § 751.06 (2003–04) (emphasis added).

From the statute's face, this court can "reverse the judgment or order appealed from . . . and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial." *Id.* The first part of the sentence clearly says that this court can reverse an "order appealed from." The court order appealed from here is the order that refused to vacate and set aside the original judgment of conviction and order a new trial.

However, if an appeal is here from that order, it does not follow that this court is powerless to reverse the underlying judgment. Note that the second part of the sentence provides the power "to remit the case to the trial court for entry of the proper judgment or for a new trial." The fact that the word "order" is not in this language may not affect this court's power to reverse the underlying judgment. That is, if an appeal is taken from an order, we may still retain the power to order a new trial or reach the underlying judgment via our discretionary reversal power.

Nonetheless, even if our power to directly reach the underlying judgment is restricted because the word "order" is not contained in that sentence, then by the statute's language, this court may still properly reverse the order that denied Armstrong's motion for a new trial and remit the case for a new trial. We can vacate the trial court's order denying the motion for new trial with directions for the circuit court to grant the motion. In any event, we leave resolution of this issue for another day.

2d 325, 611 N.W.2d 659 (citations omitted). We conclude this is an exceptional case, and invoke our inherent powers and reverse the circuit court's order denying Armstrong's request for a new trial and remand this case with directions to grant Armstrong a new trial.[26]

## B

¶ 115. As noted in *Vollmer,* this court has concluded that the real controversy was not fully tried where important evidence was erroneously excluded or where the evidence was admitted that should have been excluded. *Vollmer,* 156 Wis. 2d at 19–20. As was the case in *Hicks,* this case implicates both of these situations. *See Hicks,* 202 Wis. 2d at 161. First, the jury did not hear important DNA evidence that bore on an important issue of the case. Second, the State presented physical evidence as affirmative proof of guilt, an assertion that was inconsistent with what the later DNA analysis revealed. *See id.* Thus, the crucial issue of identification was clouded. *See id.*

¶ 116. Because of the striking similarities between the present case and *Hicks,* we set forth a detailed discussion of the *Hicks* case.

---

[26] We will assume, but not decide, that our inherent authority applies the same criteria as our statutory discretionary reversal power. Under the statutory discretionary reversal power, when the real controversy has not been fully tried, the court is not required to find a substantial probability of a different result on retrial. *Vollmer v. Luety,* 156 Wis. 2d 1, 19, 456 N.W.2d 797 (1990).

We also add that our discretionary reversal power, although to be invoked in exceptional circumstances, is plenary and not necessarily restrained by any other possible means of relief. *Compare* Roggensack, J., dissenting, ¶¶ 164, 188.

## C

¶ 117. In *Hicks,* the defendant was convicted of burglary, robbery, and two counts of sexual assault. *Hicks,* 202 Wis. 2d at 152. The convictions stemmed from allegations that the defendant, who was a black man, entered the apartment of the victim, who was a white female, with intent to commit a felony, forced the victim into two separate acts of sexual intercourse, and then stole $10. *Id.* at 153.

¶ 118. At trial, the victim testified that while she was getting ready for work one morning, she heard a knock at her apartment door around 7:25 a.m. *Id.* at 153–54. She looked through the door's peephole and saw a black man. *Id.* at 153. The victim said the man identified himself as her upstairs neighbor and asked to use her phone, as he said his phone was broken. *Id.* It was stipulated to that the defendant lived in the same apartment complex as the victim and that their apartments were within 90 seconds walking distance of each other. *Id.* at 154.

¶ 119. The victim let the man into her apartment, showed him where the phone was, and then went to the bathroom to finish getting ready for work. *Id.* at 153. She then saw the man's face behind her in the mirror. *Id.* The man threw a scarf around her head and neck to blind her and then sexually assaulted her twice over the next 30 minutes. *Id.* at 153–54. During the assault, the victim caught glimpses of the man's face and heard the man speak to her intermittently. *Id.* at 154. The victim stated the assailant left the apartment around 7:55 a.m. *Id.*

¶ 120. Two days later, the victim identified the defendant as the assailant from an eight-man line-up. *Id.* After the defendant was arrested, the police seized a

"Caucasian" head-hair they found on the inside of the pants the defendant was wearing. *Id.* The pants were apparently not the same pants the victim said the defendant was wearing at the time of the assault. *Id.*

¶ 121. A "Negro" head hair was found on the victim's comforter. In addition, 15 days after the assault, the police conducted a vacuum sweep of the victim's apartment for physical evidence and found four "Negro" pubic hairs. *Id.* The victim said only one other black person had been in her apartment before the assaults, a woman two years earlier who asked to borrow a blanket. *Id.* at 155.

¶ 122. Also recovered from the apartment were specimens of semen, blood, and saliva. *Id.* at 155. However, DNA analyses of the specimens were inconclusive due to insufficient sampling sizes. *Id.* at 155.

¶ 123. To bolster the victim's identification of the defendant as the assailant, the State presented testimony from a State Crime Lab analyst who conducted analyses of the various hairs that had been recovered. *Id.* at 154. The analyst opined that the physical characteristics of four of the five hairs found in the apartment were "consistent," while the other hair was "similar," with hairs obtained from the defendant. *Id.* at 154, 166. The analyst also opined that the physical characteristics of the hair recovered from the defendant's pants was "consistent" with the victim's hair. *Id.* at 154. The analyst agreed that unlike fingerprints, microscopic hair comparisons can never yield a definitive identification. *Id.* Thus, she stated to a reasonable degree of scientific certainty, that the hairs recovered "could have" come from the defendant and the victim. *Id.* at 154–55. The State claimed that all of the hairs

came from the same person, the defendant. *Id.* at 166. However, the State did not have DNA tests conducted on the hairs. *Id.* at 155.

¶ 124. The defendant's theory at trial was that he had never been in the victim's apartment. *Id.* at 163. The defendant's girlfriend, who was living with the defendant at the time, testified that on the day of the assaults, the defendant left the apartment around 6:40 a.m. to go to work. *Id.* at 155. However, she stated he returned about 20 minutes later because he was not feeling well. She stated she left the apartment at 7:00 a.m. to go to Rockford, Illinois. *Id.* She also presented a telephone bill that showed a call made from their apartment at 8:12 a.m. to her mother's house in Rockford. The girlfriend testified that the defendant made this call. *Id.* The defendant's employer also testified that the defendant called in sick sometime between 7:00 a.m. and 7:30 a.m. *Id.*

¶ 125. In other words, the defendant could not otherwise account for his whereabouts during the time of the assault from 7:25 a.m. until 7:55 a.m.

¶ 126. The State used the hair evidence to show that it was "more likely that [the defendant] committed the crime." *Id.* at 167. Indeed, at trial, the State characterized the evidence as "powerful" and "strong" evidence of guilt. *Id.* During the State's closing argument, in addition to relying on the victim's identification, the State relied heavily on the expert's opinion that the hairs found at the scene were consistent with or "matched" those provided by the defendant. *Id.* at 167–69. The State argued:

> Not only do we have a positive—as positive as it gets—identification by the victim of this crime of [the defendant]; but . . . [i]n addition to that, there are the

hair standards, the hair standards and unknowns, that were compared and found consistent.

. . . .

[Defense counsel] complains about 15 days! The mighty and powerful Madison Police Department waits 15 days to vacuum up the foot of [the victim's] bed!

Well, let me remind you that one of those hair samples came from the comforter. One of the hair samples, *that matched his,* that was consistent with his, came from the comforter that was seized that very morning.

The other hair samples came from the vacuumings.

And did it matter that they were 15 days later?

There were still hairs there that were consistent with his! They were still laying there. . . . Those hairs were still there, where they had been, where they had fallen when he was in that apartment. They were still there, to be *matched up with his.*

*Id.* 167–69 (emphasis added.)

¶ 127. Regarding the consistency with the hair recovered from the defendant's leg, the State claimed:

The other hairs. Remember, the one that came out of his pants, that matched her head, was taken diligently when [the victim] was taken for an exam and her hair standards were pulled.

And when he's taken into custody, those pants are taken into custody. And, lo and behold, that's where her comparison, her hair comparison comes from!

*Id.* at 169.

¶ 128. The State best summarized its case with the following argument in closing:

688

"Here's a guy that matches the description. Let's put him in a line-up."

And, lo and behold, [the victim] says, "That's him. I'm certain that's him."

And, lo and behold, he lives right—a minute and a half away from her!

And, lo and behold, *his hair matches up.*

And her hair is in his clothes! Her hair is in his clothes.

*Id.* at 169–70 (emphasis added.)

¶ 129. The jury convicted the defendant on all charges.

¶ 130. Postconviction DNA testing, however, revealed inconclusive results as to the source of the hair found on the defendant's pants, the head hair obtained from the victim's comforter, and two of the pubic hairs obtained from the vacuum sweep. *Id.* at 156. Of the other two pubic hairs, one of them actually revealed the presence of two different DNA sources, with the other DNA source possibly stemming from blood or semen on the hair. *Id.* The defendant was excluded as the main source of DNA, but the DNA testing expert could not form a conclusion as to his connection with the other DNA source. *Id.* From DNA testing of the other pubic hair, which the expert agreed may also have contained two different DNA sources, the expert testified that the defendant was not the source of that pubic hair. *Id.*

¶ 131. The circuit court denied the defendant's motion for a new trial. *Id.* at 157. In an ineffective assistance of counsel analysis, the trial court concluded that it was not reasonably probable that the DNA testimony would result in a different verdict at a new

trial. *Id.* at 157. The court of appeals reversed, concluding that the defendant's counsel was ineffective for failing to have the pubic hair subjected to DNA analysis. *Id.* at 152. This court affirmed, but on different grounds. This court used its discretionary reversal powers because the real controversy was not fully tried. *Id.* at 152–53.

¶ 132. This court determined that the sole issue in the case was identification: "whether [the defendant] was the man that entered [the victim's] apartment and assaulted her." *Id.* at 163. However, the jury "did not have an opportunity to hear and evaluate evidence of DNA testing which excluded [the defendant] as the source of one of the four pubic hairs found at the scene." *Id.* Quite to the contrary, the State presented the hair consistency evidence as "affirmative proof of guilt," an assertion later discredited by the DNA tests. *Id.* at 161, 163. Because the defendant's theory was that he had never been in the victim's apartment, and because of the inconclusiveness of the other DNA results, this court concluded the conclusive DNA test that excluded the defendant as the source of the hair "could have been a crucial, material piece of evidence."[27] *Id.* at 164.

¶ 133. That DNA tests were later done, however, did not of itself warrant discretionary reversal, this court stated. Instead, the determinative factor was "that the State assertively and repetitively used hair evidence throughout the course of the trial as affirmative proof of [the defendant's] guilt." *Id.* This court observed:

---

[27] This court recognized that the jury did not hear of the DNA evidence not because the trial court erroneously excluded it, but because the results did not yet exist. *State v. Hicks*, 202 Wis. 2d 150, 164, 549 N.W.2d 435 (1996).

> The State went to great lengths to establish that the hairs found at the scene came from the assailant. In opening and closing arguments, the State relied heavily upon its expert's opinion that the hairs found at the scene were consistent with known standards provided by [the defendant]. At various times, the State referred to a "match" between the hairs, thus elevating and highlighting the importance of the hair evidence to the jury.

*Id.* at 164.

¶ 134. On appeal, the State attempted to downplay its use of the hair evidence at trial and went so far as to discount the value of the evidence. *Id.* at 165, 166. This court was not persuaded, stating "a review of the record leads us to the opposite conclusion. The State used this hair evidence throughout the trial as affirmative proof of [the defendant's] guilt." *Id.* Indeed, this court noted that the State characterized the evidence as "strong" and "powerful" in the trial court. *Id.* 166–67.

¶ 135. After detailing the State's use of the evidence in its closing argument, this court concluded that "[b]ased on a review of the record, we simply cannot say with any degree of certainty that this hair evidence did not influence the verdict." *Id.* at 171. In this court's view, the new DNA results did much more than merely "chip away" at the State's case, as the State's case leaned on the victim's identification and assertion that no black person had been in her apartment in two years. *Id.* This court concluded that "[t]o the extent that the jury may have had questions about the accuracy of [the victim's] identification, these questions were likely answered by the State's affirmative use of the hair evidence." *Id.* Therefore, this court held:

> [T]he real controversy was not fully tried inasmuch as: (1) the DNA evidence excluding [the defendant] as the

691

donor of one of the hair specimens was relevant to the critical issue of identification; (2) the jury did not hear this evidence; and (3) instead, the State used the hair evidence assertively and repetitively as affirmative proof of [the defendant's] guilt.

*Id.* at 172.[28]

## D

¶ 136. The State attempts to distinguish the present case from *Hicks* on the following grounds: (1) in *Hicks,* the defendant's appeal was on direct appeal shortly after the conviction, whereas Armstrong's appeal is premised on a Wis. Stat. § 974.06 (2001–02) motion filed 20 years after his trial; (2) in *Hicks,* there was no reasonable explanation for the defendant's hair to be in the victim's apartment unless he was there, where here Armstrong admitted to being in Kamps' apartment; (3) in *Hicks,* the prosecutor focused repeatedly on the hair evidence as proof of guilt, whereas here the prosecutor argued the physical evidence only provided an inference of guilt while focusing on all the other evidence; and (4) in *Hicks,* the State did not have an abundance of strong, circumstantial evidence of guilt, whereas here the State claims it does. We are not persuaded.

### 1

¶ 137. First, we have already concluded that we have inherent power to reverse a conviction and order a

---

[28] Even a casual reading of *Hicks* reveals how the dissent's distilled discussion of that case does violence to its holding. *Compare Hicks,* 202 Wis. 2d at 172 (focusing on *State's* use of evidence assertively and repetitively as affirmative proof of the defendant's guilt), with Roggensack, J., dissenting, ¶¶ 182–86 (construing *Hicks* as focusing on the *defendant's* theory of the case and whether new evidence undermines his or her defense).

new trial in the interests of justice. Further, the timing of Armstrong's appeal 20 years after his conviction is not a meaningful distinction. It is true that Armstrong's trial occurred long before the advent of DNA testing. However, we agree with Armstrong that it was only through technological happenstance that DNA testing was available to the defendant in *Hicks* on his direct appeal.

### 2

¶ 138. The State's second distinction escapes us. It is true that the defendant in *Hicks* claimed he was never in the victim's apartment. However, here, Armstrong claims he was not in Kamps' apartment at the time of her murder. The State used the hair evidence to prove that Armstrong *must* have been in the apartment when Kamps was murdered. That is, the State used the evidence in exactly the same manner as in *Hicks,* and, based on our discussion below, the evidence was just as damaging against Armstrong.[29]

### 3

¶ 139. The State's third distinction is disingenuous. At trial, the State did more than simply use the physical evidence to establish an inference of guilt; it

---

[29] The dissent argues that "finding hair consistent with Armstrong's did not undermine his defense." Roggensack, J., dissenting, ¶ 186. This point is absurd. If Armstrong's defense was that he was not there when Kamps was murdered, the State's affirmative and repetitive use of the hair evidence as "conclusive" proof that Armstrong was the murderer absolutely undermined his defense.

used the physical evidence assertively and repetitively as affirmative proof of Armstrong's guilt.

¶ 140. In closing argument, the State presented its case as boiling down to five points:

> All the evidence that we have presented demonstrates beyond any doubt that Ralph Armstrong was at Charise Kamps' apartment in the early morning hours of June 24, 1980, murdering and sexually assaulting her.
>
> . . . .
>
> . . . We divided the evidence that has been presented at this trial into five areas. The first area is times. The defendant could not have been at Charise Kamps' at a time he said he was. And the evidence exclusively shows that it was impossible.
>
> The second area of evidence deals with the testimony of Riccie Orebia and Laura Chafee at 134 West Gorham and 120 West Gorham and who made certain observations to put Ralph Armstrong at Charise Kamps' apartment after midnight of June 24, 1980.
>
> *There was physical evidence at the scene. Physical evidence to demonstrate conclusively that Ralph Armstrong is the person who murdered Charise Kamps.*
>
> *There is also physical evidence on Ralph Armstrong that ties him precisely with the scene of the crime.* That's the third area.
>
> The fourth is the defendant's interest in Charise Kamps testified to by a number of witnesses and grudgingly admitted by the defendant. And evidence very clearly on the evening of June 23, 1980, he was with Jane May later in the evening when he went out with her and, finally, when he went over to her apartment and he conveniently murdered her.

Finally, there is the issue of the defendant's credibility. The defendant got up here and lied through his teeth. (Emphasis added.)

¶ 141. After arguing why Armstrong could not have been where he claimed he was at the time of Kamps' murder, the State focused on the physical evidence:

You have heard a lot of description about the physical evidence that was found at the scene, of people describing the body, about items of evidence that were collected at the scene, hairs, blood samples, analyses conducted subsequent to that. The police were called to the scene at about one o'clock on June 24, 1980. They go there. The first thing they did was they took pictures because they wanted to preserve the scene and check the evidence afterwards.

¶ 142. Regarding the hairs found on Kamps' robe, the State claimed:

Now, you have an opportunity to see what that scene looked like right after Ralph Armstrong committed the murder (indicating).[30] That's what they saw on the bed (indicating). Charise Kamps. That was Charise Kamps. I want you to look at the smear marks on the legs. You can't see it real well from this angle (indicating). You have heard Officer Fisher describe it. You heard Jane May describe it. It says it was like finger paints (indicating). So, Charise Kamps was found in blood and feces and on her bed with that robe on. This is it (indicating) lying on top of Charise Kamps' body.

---

[30] As noted above, the indications the State made were to crime scene photographs depicting Kamps' body "nude, lying on her face, with blood smeared on her back, buttocks and thighs." *Armstrong,* 110 Wis. 2d at 579.

695

*Two of the defendant's hairs were on this robe.* One of Charise Kamps' hairs right there across the body (indicating).

¶ 143. Regarding the findings of trace amounts of blood underneath Armstrong's thumbnails, the State maintained:

> The defendant's fingers were tested down at the police station. Jill Wegner ran the hemosticks around the cuticles and under the thumb and under the nails and around the cuticles of every finger and lo and behold there was blood under every fingernail, every single one. *That was Charise Kamps' blood.* (Emphasis added.)

¶ 144. Finally, regarding the semen on Kamps' robe, the State argued:

> This picture shows Charise Kamps' robe. (Indicating.) It's right next to the bed. You heard testimony about that robe. Jill Wegner performed tests on it and she looked for seminal material and she found it. Found spots of it. She did an analysis on that. She was trying to determine the blood type of the person who put seminal fluids on the robe. So, she analyzed it and found that it came from a person with type A blood who secreted this blood type in his body fluid, in his semen, in his saliva, in his tears. And she analyzed Ralph Armstrong's blood and saliva. Ralph Armstrong's a type A secretor.

¶ 145. In rebuttal, the State summed up the physical evidence as follows:

> *The physical evidence on Ralph Armstrong at the scene ties him irrevocably to the murder of Charise Kamps.* That Ralph Armstrong was in the apartment of Charise Kamps. And that's that certainty that's not less important that the defendant is a liar. (Emphasis added.)

696

¶ 146. As in *Hicks,* the State now attempts to downplay the significance of its use of the physical evidence.[31] *See Hicks,* 202 Wis. 2d at 165. An examination of the State's closing argument, however, belies the State's assertion that it merely used the evidence to establish an "inference of guilt." Indeed, in stark contrast to *Hicks,* where the State argued the hairs "matched" the defendants, the State in this case went further, much further. The State argued that the physical evidence "conclusively" demonstrated that Armstrong was the murderer. The State argued that there was no explanation for the hair in Kamps' apartment except for the fact that he was the murderer. And the State argued that the blood found underneath Armstrong's nails was Kamps' blood.[32]

4

¶ 147. Finally, the State argues it had a stronger circumstantial evidence case against Armstrong than it did against the defendant in *Hicks,* including eyewit-

---

[31] The State goes so far as to now argue:

The new DNA evidence is, at most, proof that the two head hairs came from an unidentified, unknown person at an unknown time and in an unknown manner. Given the mobility of hair, the source of the two hairs may be a person who was never even in Kamps' apartment, or who was never there until after the body was discovered. The new DNA evidence makes it probable that the hairs are simply not connected to the crimes at all.

The State has put on the defense's hat, as this "mobility of hair" is precisely the argument that Armstrong presented to the jury in 1981. The jury did not buy it.

[32] The only evidence the State presented that arguably established nothing more than an inference of guilt was the semen evidence, as the State noted it came from a type A secretor and then noted only that Armstrong was such a secretor.

ness testimony that identified Armstrong as the man who entered and exited Kamps' apartment at the crucial time, that Armstrong's alibi was demolished, that Armstrong made a deposit of money the day after Kamps' murder that was similar to an amount that was missing from Kamps' apartment, and that the jury evaluated Armstrong's credibility in light of the fact that he had six prior convictions. In light of *Hicks,* we are not persuaded that this circumstantial evidence weighs heavily, if at all, in the State's favor.

¶ 148. Regarding identifications, Orebia saw the perpetrator from some distance. While Orebia vacillated on multiple occasions about what he saw (and although it appears that his recollection was later refreshed by hypnosis),[33] he ultimately remained firm that Armstrong was the person he saw.

¶ 149. By contrast, in *Hicks,* the victim saw the perpetrator up-close and in person. *Hicks,* 202 Wis. 2d at 154. From our reading of *Hicks,* there is no indication that the victim wavered on her identification. Nevertheless, this court still reversed because of the State's use of the hair evidence as affirmative proof of guilt. This court wrote: "To the extent that the jury may have had questions about the accuracy of [the victim's] identification, these questions were likely answered by the State's affirmative use of the hair evidence." *Id.* at 171. The same is true here.

¶ 150. Regarding alibi evidence, Armstrong has crafted an intricate argument to show why the State's assertion that his alibi was impossible is wrong. The

---

[33] In *Armstrong,* 110 Wis. 2d at 565–76, which was Armstrong's direct appeal, this court established the framework for determining the admissibility of hypnotically refreshed recollection and concluded that the procedures used to hypnotically refresh Orebia's testimony were not impermissibly suggestive.

State, of course, refutes this by noting the jury did not accept Armstrong's explanation of his whereabouts. However, this does not militate against Armstrong.

¶ 151. In *Hicks,* the defendant, who lived in the same apartment complex as the victim and within 90–seconds walking-distance, could not prove he was somewhere else at the time of the assaults. *Id.* at 154. He had evidence to show that he was not in the victim's apartment both before and after the assaults, but he could not confirm where he was during the time of the assaults from 7:25 a.m. to 7:55 a.m. *See id.* at 154–55, 163. Nevertheless, this court reversed because of the manner in which the State used the hair evidence as affirmative proof of guilt. *Id.* at 172. The State has done the same thing here.

¶ 152. Last, with respect to the deposit of money Armstrong made the morning after the murder and how such a deposit was out of character for him, and with respect to the jury's assessment of Armstrong's credibility in light of his six prior convictions, we cannot place great weight on this propensity and character evidence. Surely it adds to the State's case, but the evidence can hardly be categorized as strong circumstantial proof that removes this case from the realm of *Hicks,* in light of what we now know about how the hair, semen and blood evidence and how it was used by the State.

¶ 153. Therefore, we are not persuaded that the circumstantial evidence presented by the State distinguishes this case from *Hicks.*

E

¶ 154. Based on a review of the record, we simply cannot say with any degree of certainty that the physical evidence did not influence the jury's verdict. *See*

*Hicks,* 202 Wis. 2d at 171. The sole issue in the case was one of identification: whether Orebia saw Armstrong enter Kamps' apartment at the time of Kamps' murder. *Compare id.* at 163. To bolster Orebia's identification, the State flaunted powerful conclusions before the jury that the physical evidence conclusively and irrevocably established Armstrong as the murderer. However, the jury was presented conclusions based on evidence that are now found to be inconsistent with the facts. The key hairs on the bathrobe belt that was draped over Kamps' body are not Armstrong's and the semen found on Kamps' robe is not Armstrong's. In addition, there is no indication that any blood that may have been on the hemosticks was that of Kamps.[34]

¶ 155. The jury did not have an opportunity to hear and evaluate the DNA evidence that excludes Armstrong as the source of the hairs and the semen. This is not evidence that tends to "chip away" at the accumulation of the State's evidence. *Compare id.* at 171. The DNA evidence discredits one of the pivotal pieces of proof forming the very foundation of the State's case. If the State's theory is correct, that the semen is from the murderer and that the murderer's hairs fell on the bathrobe belt that was draped across Kamps' body, then that person is not Armstrong. To the extent the jury had doubts about Orebia's testimony or the inference to draw from Armstrong's deposit of money the day after Kamps' murder, those questions

---

[34] By making this observation, we do not disregard any of the circuit court's findings. *Contra* Roggensack, J., dissenting, ¶ 173. Instead, we simply recognize the limitation of this physical evidence: Wegner herself testified that she could not determine the source of the human blood found underneath Armstrong's fingernails and big toenails, yet the State argued that it was in fact Kamps' blood.

were likely answered by the State's use of the physical evidence. *See Hicks,* 202 Wis. 2d at 171 ("To the extent that the jury may have had questions about the accuracy of [the victim's] identification, these questions were likely answered by the State's affirmative use of the hair evidence.").

¶ 156. The DNA evidence now excludes Armstrong as the donor of certain physical evidence that was relevant to the critical issue of identity; the jury did not hear this evidence, and the State used the physical evidence assertively and repetitively as affirmative proof of Armstrong's guilt. Because of the affinity between this case and *Hicks,* we reverse Armstrong's judgment of conviction in the interests of justice because the real controversy was not fully tried. Therefore, we remand this matter for a new trial.

## III

¶ 157. Both parties have briefed arguments concerning whether Armstrong is entitled to a new trial because the DNA results constitute newly discovered evidence. Because our decision rests on the interests of justice, we decline to decide whether a new trial should be ordered based on newly discovered evidence.[35] Nevertheless, we take this opportunity to clarify the proper test for analyzing newly discovered evidence.

---

[35] We note that there are problems with the dissent's "mountain of other evidence incriminating Armstrong that is not affected in any way by the DNA test results at issue here." Roggensack, J., dissenting, ¶ 174. Here are some of those problems.

First, the dissent contends that the eyewitness testimony placed Armstrong and Armstrong's vehicle "at Kamps' apartment at the time of the murder." *Id.* Actually, the best the State could determine was that Kamps was murdered anywhere from mid-

¶ 158. Quoting *State v. Avery*, 213 Wis. 2d 228, 234, 570 N.W.2d 573 (Ct. App. 1997), the court of appeals below set forth the standard as follows:

> Under [a newly discovered evidence] test, Armstrong would have to prove, by clear and convincing evidence, all of the following:
>
> (1) The evidence must have come to the moving party's knowledge after a trial; (2) the moving party must not

night to 3:00 a.m. Thus, the evidence placed Armstrong and his vehicle at Kamps' apartment building *around, not at*, the time of the murder.

Second, the dissent contends that there was "human blood around all 10 of Armstrong's fingers and on his toes . . . ." *Id.* Actually, Wegner's hemostick test results were *presumptive positives for the presence of blood.* From this alone, Wegner *could not* determine whether the blood was human or whether it was even blood in the first instance. *See* I.B.3.c. *infra.* Wegner did take scrapings from underneath Armstrong's thumbs and big toes and did determine that there was human blood *underneath both thumbnails and big toes.* She did not conduct scrapings under the rest of Armstrong's fingers or toes.

Third, the dissent contends that Armstrong's failure to call his brother at trial as a material witness to corroborate Armstrong's testimony weighs against Armstrong. *Id.* This is little more than burden shifting, and the dissent has not explained how this is in anyway proper.

Fourth, the dissent states that Armstrong's brother did not file an affidavit with Armstrong's current motion for a new trial. *Id.* However, the dissent does not explain how this affects whether a different result would occur at a new trial. While such an affidavit, if filed, would be relevant to support his motion, the converse is not true. The statement is irrelevant.

Properly viewing the evidence, the dissent's "mountain of evidence" may be little more than a molehill. *See id.* However, we do not reach the issue of whether there is a reasonable probability that a different result would be reached at a new trial.

have been negligent in seeking to discover it; (3) the evidence must be material to the issue; (4) the testimony must not be merely cumulative to the testimony which was introduced at trial; and (5) it must be reasonably probable that a different result would be reached on a new trial.

*Armstrong*, Nos. 2001AP2789–CR and 2002AP2979–CR, unpublished slip op., ¶ 32.

¶ 159. An issue in *Avery* was whether the clear and convincing standard applies to the reasonable probability factor. The defendant agreed that the standard of proof in a newly discovered evidence claim was "clear and convincing evidence," but argued that the standard of proof was irrelevant because the facts were undisputed in his case. *Avery*, 213 Wis. 2d at 235. The court of appeals rejected this argument, stating that "[a] fact finder does not operate in a vacuum. Rather, the fact finder necessarily needs a standard by which to measure whether certain facts warrant the relief sought." *Id.* at 236. Thus, the court of appeals concluded that a defendant must establish by clear and convincing evidence that there is a reasonable probability that a different result would be reached on a new trial.

¶ 160. Amicus for the Innocence Project contends the *Avery* court erred by imposing a double burden on defendants, first that there is a reasonable probability of a different result and then second, that that there is clear and convincing evidence of that reasonable probability. The Innocence Project argues that the "reasonable probability" factor is itself a burden of proof.[36] We agree.

---

[36] Alternatively, Armstrong argues that we should at least lower the burden to a preponderance of the evidence.

703

¶ 161. In *State v. McCallum,* 208 Wis. 2d 463, 473, 561 N.W.2d 707 (1997), this court specifically attached the burden of proof of clear and convincing evidence only on the first four criteria in the newly discovered evidence. This court stated:

> First, the defendant must prove, by clear and convincing evidence, that: (1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative. If the defendant proves these four criteria by clear and convincing evidence, the circuit court must determine whether a reasonable probability exists that a different result would be reached in a trial.

¶ 162. In other words, there need only be a reasonable probability that a different result would be reached in a trial. There are no gradations of a reasonable probability; either there is one, or there is not. Therefore, we withdraw language from *Avery* that concludes the reasonable probability determination must be made by clear and convincing evidence.

## IV

¶ 163. In sum, we conclude that Armstrong is entitled to a new trial in the interest of justice because the real controversy was not fully tried.[37] Therefore, we reverse the court of appeals' decision and remand this case to the circuit court with directions to grant his motion to vacate the judgment of conviction and to order a new trial.

---

[37] In *Hicks,* this court observed that "[t]here is no question that the State very capably and professionally presented its case to the jury." *Id.* at 172. We agree with that sentiment here. Nevertheless, the interests of justice now require a new trial.

704

*By the Court.*—The decision of the court of appeals is reversed and the cause remanded to the circuit court for further proceedings consistent with this opinion.

¶ 164. PATIENCE DRAKE ROGGENSACK, J. (*dissenting*). The majority opinion reverses the court of appeals decision affirming the circuit court's order denying Ralph Armstrong's motion to vacate his judgment of conviction, and it then concludes that Armstrong is entitled to a new trial. Majority op., ¶ 2. The majority opinion does so based on its conclusion that the results of DNA tests that have been recently completed prove the real controversy was not fully tried. Majority op., ¶ 2. However, the actual issue in this case is whether the DNA evidence, which is newly discovered, creates a reasonable probability of a different outcome at a new trial. *See State v. McCallum,* 208 Wis. 2d 463, 474, 561 N.W.2d 707 (1997). The majority opinion is able to side-step our well-established jurisprudence for newly discovered evidence and conclude that Armstrong is entitled to a new trial only by avoiding the crucial analysis of whether this DNA evidence creates a reasonable probability that a different result would be reached at a new trial. Because I conclude that this evidence does not create a reasonable probability that a different result would be reached at a new trial and because I conclude that the real controversy, whether Armstrong raped and murdered Charise Kamps, was fully tried in 1981, I respectfully dissent from the majority opinion. Accordingly, I would affirm the court of appeals.

## I. DISCUSSION

¶ 165. Armstrong's claim of newly discovered evidence sufficient to vacate his conviction is based on recent DNA testing of two hairs found in Kamps'

apartment and semen stains found on Kamps' bathrobe showing neither the hair nor the semen is his. DNA testing was not available in 1981 when Armstrong was tried.

A. Newly Discovered Evidence

¶ 166. In order to set aside a judgment of conviction, newly discovered evidence must be sufficient to establish that a defendant's conviction was a manifest injustice. *State v. Krieger,* 163 Wis. 2d 241, 255, 471 N.W.2d 599 (Ct. App. 1991). The test for determining whether the proffered evidence is "newly discovered" and whether it meets the test of "manifest injustice" has been explained many times. The court of appeals clearly set out the criteria a defendant must meet in order to overturn a conviction based on an allegation of newly discovered evidence as follows:

> (1) The evidence must have come to the moving party's knowledge after a trial; (2) the moving party must not have been negligent in seeking to discover it; (3) the evidence must be material to the issue; (4) the testimony must not be merely cumulative to the testimony which was introduced at trial; and (5) it must be reasonably probable that a different result would be reached on a new trial.

*State v. Avery,* 213 Wis. 2d 228, 234, 570 N.W.2d 573 (Ct. App. 1997) (quotation omitted). If a defendant proves the first four criteria set out above by clear and convincing evidence, then "the circuit court must determine whether a reasonable probability exists that a different result would be reached" at a new trial. *McCallum,* 208 Wis. 2d at 473. The first four criteria are questions of fact that are not contested here. *See id.* at 473.

706

¶ 167. The fifth criterion sets up a question of law, i.e., whether the facts of the case meet the legal standard of a reasonable probability of a different outcome at a new trial.[1] *Id.* In assessing this legal standard, we must determine whether there is a reasonable probability that a jury, looking at all the relevant evidence in regard to whether the defendant did or did not commit the crime, would have reasonable doubt as to the defendant's guilt. *See id.* at 474. This examination requires an assessment of *all the evidence* to determine what effect, if any, the newly discovered evidence would be reasonably probable to have on a jury's verdict at a new trial. *See id.*

¶ 168. Part of the new evidence proffered by Armstrong is DNA testing that shows that two head hairs found on the belt of Kamps' bathrobe did not come from him. One of these hairs had previously been characterized as "consistent" with Armstrong's hair and the other had been characterized as "similar" to Armstrong's hair. At trial, Coila J. Wegner, the State's expert, testified about her examination of eight exhibits that contained hair samples taken from Kamps' apartment. She explained that the tests she ran could exclude donors of the hair, but not identify them. When she described the hair from eight exhibits, she explained that for 36 of the hairs she could not exclude Kamps as the donor, but she

---

[1] I would apply the newly discovered evidence test as it repeatedly has been stated, rather than change it to omit the requirement that the fifth criterion be proved by clear and convincing evidence, as the majority opinion does. Majority op., ¶ 162. However, I do not address it further, and I do not require the fifth criterion to be met by clear and convincing evidence in this dissent, because it appears that this change in the law was inserted, albeit without any explanation, into *State v. McCallum,* 208 Wis. 2d 463, 474, 561 N.W.2d 707 (1997).

could exclude Armstrong as the donor. For six of the hairs,[2] she could not exclude Armstrong as the donor, but she could exclude Kamps. Only two of the six hairs for which Armstrong could not be excluded as the donor were subjected to DNA testing. For thirteen hairs, both Kamps and Armstrong were excluded as donors, and nine of the hairs she examined were animal hairs. A review of Wegner's testimony about what she said she could determine relative to the donors of the hair samples is helpful to a consideration of how important this newly discovered evidence is in the context of all the evidence presented at trial. Wegner testified as follows:

Q: And what was the result of that comparison?

A: The head hair was consistent in microscopic characteristics with the standard head hair from Miss Kamps. It was not consistent in microscopic characteristics with the hair from Mr. Armstrong.

Q: Now let me understand something. With hair analysis when you say it was consistent, you can say that testimony or she cannot be eliminated as the source of the hair?

A: That is correct.

Q: And when you say it is not consistent, you are saying that that person or that standard is eliminated as a source of the hair?

---

[2] Hairs for which Armstrong could not be excluded as the donor were found in Exhibit 27 (hair taken from the belt of Kamps' bathrobe), Exhibit 29 (hair taken from the bathroom sink) and Exhibit 43 (hair taken from blood and fecal-like material near Kamps' body).

708

A: That is correct.

Q: So this is a hair or examination which only excludes a person, it never includes a person?

A: It could include them, but not identify them.

Q: It can't identify them?

A: No, sir.

Q: Is there any—any method whatsoever similar to fingerprints for identifying a given hair with a given person where you can say with a certainty or to a reasonable degree of scientific certainty that this hair came from this person?

A: In ninety-nine point nine (99.9%) percent of the time you could not say that a specific hair came from a specific individual.

Wegner was very clear about the probative value of the hair analyses she completed.

¶ 169. In closing argument, the district attorney argued that the hairs for which Armstrong could not be excluded as a donor were his and tied him to Kamps' murder. Armstrong's attorney argued that the hair analyses did not identify Armstrong as the donor of the hairs, only that he could not be excluded as the donor. He also argued that Armstrong admitted to being in Kamps' apartment earlier in the evening of her murder and because hairs move freely from place to place, the presence of those hairs did not show Armstrong committed the crimes. He said that the movement of hair was demonstrated by the presence of animal hairs in Kamps' apartment when she never had a pet.

¶ 170. Armstrong also proffered DNA testing of semen samples from Kamps' bathrobe that showed they came from Brian Dillman, Kamps' fiancé, as newly discovered evidence. At trial, Wegner testified that a semen stain that was found on Kamps' bathrobe was made by a Type-A secretor. She testified that both Armstrong and Dillman are Type-A secretors. Wegner also testified that 80% of the population are Type-A secretors. In closing argument, the district attorney said that the semen stains were made by a Type-A secretor and that Armstrong was a Type-A secretor. Armstrong's attorney carefully explained that Dillman and Kamps were lovers, and because Dillman was a Type-A secretor, the semen was his. He also repeated Wegner's testimony that 80% of the population are Type-A secretors. Therefore, the jury could not have given this evidence much weight in reaching its verdict that Armstrong raped and murdered Kamps.

¶ 171. There is another fact that bears on the testimony about semen. Kamps was raped anally and vaginally with a hard object. Her injuries were not caused by being raped with a body part. Therefore, it is understandable that semen from the perpetrator of this crime was not left at the crime scene.

¶ 172. It is important to keep in mind that the DNA evidence Armstrong proffers is not exonerating evidence as DNA evidence can sometimes be. Instead, this evidence affects *only one part of one of the five categories of evidence* the State presented to the jury. And, it does not affect Armstrong's defense: that he was at Kamps' apartment, but not at the time of her murder. Physical evidence that was presented to the jury included Armstrong's fingerprint on a bong in

Kamps' apartment;[3] six hairs; possible connection to the semen stains on Kamps' bathrobe; human blood around all 10 of Armstrong's fingers and around his toes, except for his two little toes, and blood on his watch; blood smearing on Kamps' body and face, as though she had been "finger-painted" with her own blood;[4] Armstrong's deposit of $315 later on the morning of the murder, when the $400 Armstrong had paid to Kamps was missing from her apartment after the murder; and the lack of a forced entry into Kamps' apartment the night of the murder. The DNA test results do not affect most of this physical evidence.

¶ 173. The majority opinion implies that the testimony of Dr. Edward Blake that he could not detect blood when he examined a piece of cloth and accompanying slides prepared from the scrapings from Armstrong's thumbs and great toes undermines Wegner's testimony that she detected human blood around all Armstrong's fingers and around most of his toes. Majority op., ¶ 95. However, the circuit court found that Blake's testimony in this regard *was not credible*. This is a finding that we are not free to disregard. *Micro-Managers, Inc. v. Gregory,* 147 Wis. 2d 500, 512, 434 N.W.2d 97 (Ct. App. 1988) (the determination of a witness's credibility is for the circuit court). Therefore, the blood evidence potentially linking Arm-

---

[3] This is the only fingerprint of Armstrong's found in the apartment, which is curious given that Armstrong testified that he drank a half glass of orange juice, a bottle of beer and played music on Kamps' turntable when he was there.

[4] Ms. Wegner testified that she did not check the bathroom for blood because she was not asked to do so. Therefore, the jury heard no testimony about whether the murderer cleaned up in Kamps' bathroom before leaving the scene.

strong to the murder has not been refuted by the defense, and remains part of the State's case.

¶ 174. In refusing to apply the newly discovered evidence test, the majority opinion improperly ignores the mountain of other evidence incriminating Armstrong that is not affected in any way by the DNA test results at issue here: (1) the time evidence presented by the State, showing that Armstrong could not have been at Kamps' apartment between 9:10 and 9:30 p.m. as he testified at trial that he was; (2) Armstrong's fingerprint in Kamps' apartment; (3) the eyewitness testimony that placed Armstrong's car at Kamps' apartment at the time of the murder; (4) the eyewitness testimony placing Armstrong at Kamps' apartment at the time of the murder; (5) the missing $400 from Kamps' apartment and Armstrong's deposit of $315 the next day;[5] (6) the lack of a forced entry into Kamps' apartment, suggesting she voluntarily let in her murderer; (7) the romantic interest Armstrong had in Kamps and her rebuff of that interest; (8) the human blood around all 10 of Armstrong's fingers and on his toes and the blood on his watch; (9) the parking ticket showing Armstrong's car was not parked near the back door of May's apartment where he said he entered; (10) the testimony that someone was heard entering May's

---

[5] Armstrong did not mention his trip to the bank, but instead said that after leaving May's apartment, he drove around in Brittingham and James Madison parks looking for a source of cocaine before going to Kamps' apartment. He told police that he got some cocaine from a "well-dressed" African-American male who was about "five-seven, five nine" with a medium "afro" and "a mustache that turns into sideburns." Armstrong changed this detailed story after he learned that law enforcement knew that he had deposited $315 the morning Kamps' body was discovered.

apartment building between 3:30 and 5:00 the morning Kamps was killed; (11) the repetitive lies Armstrong told to law enforcement and to the jury; (12) the lack of trial testimony by Armstrong's brother, who could have corroborated Armstrong's testimony that his brother was the source of the $315 Armstrong deposited and who could have verified part of Armstrong's alibi; and (13) the lack of an affidavit from Armstrong's brother for these motions. The majority opinion errs in its utter disregard of this mountain of evidence.

¶ 175. In regard to the issue of time, the majority opinion repeats Armstrong's mantra that he left his apartment in Fitchburg at 9:10 p.m., drove to May's apartment in Madison and dropped her off, drove to Kamps' apartment, spent about 15 minutes at Kamps' apartment drinking a beer, drinking some orange juice and playing music and then drove to Brent Goodman's house to buy cocaine, arriving there by 9:30 p.m.[6]

---

[6] In his brief to this court, Armstrong includes "Mapquest" printouts showing driving times, which he implies, show that he could have done all that he alleges before going to Brent Goodman's at 9:30 p.m. The State properly objected to this presentation as evidence never presented at trial. However, even using the times from Mapquest, it is not possible to do what Armstrong said he did because from his apartment to Kamps' address, Mapquest lists 12 minutes; from Kamps' to May's one minute and from Kamps' to Goodman's 10 minutes, a total of 23 minutes. This is not the route that Armstrong testified he drove, in regard to his stop at Kamps' before he went to Goodman's, because he said he first dropped May off at her apartment and changed from his car to Kamps' car. However, even adding the numbers from Mapquest shows a lapse of 23 minutes after he left his apartment in Fitchburg, when he had only 20 minutes available before Goodman testified he was at his house. The 23 minutes from Mapquest also includes no time for getting people in and out of the car, changing cars and going

Majority op., ¶¶ 22–24. Armstrong had to place himself at Kamps' between 9:10 and his arrival at Goodman's at 9:30, if he was to cover for any evidence he may have left at Kamps' apartment at the time of the murder. However, it is not possible to do all Armstrong says he did in the 20 minutes between when he left his apartment and arrived at Goodman's. I agree with the circuit court that if the jury had believed Armstrong's time evidence, he would not have been convicted.

¶ 176. The majority opinion also ignores how the immediate and unwavering description of a car that matched Armstrong's car as the vehicle seen at Kamps' apartment at the time of the murder, strengthens the eyewitness's identification of Armstrong as the man who drove that car and went in and out of Kamps' apartment three times after midnight on the night Kamps was murdered. The majority opinion diminishes Riccie Orebia's identification of Armstrong as the man Orebia saw because Orebia was a reluctant witness and had been hypnotized. However, Orebia gave an accurate description of Armstrong's car long before being hypnotized. That description never changed.

¶ 177. The jury's decision reflects its consideration of *all five categories*[7] of evidence the State presented. It cannot be ignored that if the jury had believed

into Kamps' apartment for 15 minutes as Armstrong said he did, coming out, starting up the car and driving to Goodman's. The 23 minutes also allocates nothing for all the traffic lights along the routes shown on the Mapquest printouts. However you slice it, Armstrong could not have done all that he said he did in 20 minutes.

[7] In order to summarize the evidence the State presented, the district attorney suggested it represented five categories: time evidence, testimonial evidence of Riccie Orebia and Laura Chafee, physical evidence, testimonial evidence of Armstrong's

Armstrong's trial testimony about his being at Kamps' earlier in the evening, while also believing the two strands of hair were his, the jury would have acquitted him. This is so because the jury was offered an explanation of how Armstrong's hairs could have attached to the bathrobe belt. As the crime scene photo shows, the bathrobe belt was placed over Kamps after she was murdered and smeared with her own blood. Therefore, that belt must have been elsewhere in the apartment, where it could easily have picked up the hairs that were found on it, prior to its being placed on Kamps' body. If the jury had believed Armstrong, they would have believed the explanation Armstrong's attorney provided. However, the jury saw Armstrong testify. The jury did not believe him. By refusing to apply the newly discovered evidence test, the majority opinion ignores that crucial credibility determination.

¶ 178. The State presented an extraordinary amount of evidence, from a fingerprint to eyewitness identification of both Armstrong and his car, to prove that Armstrong was Kamps' murderer. The question the evidence presented at trial was, "Given the evidence before you, did Armstrong murder Kamps?" Taking away a piece of evidence from all that was presented in this case does not change the ultimate question. Armstrong testified that he was in Kamps' apartment. His defense was that he was not there when she was killed. He said he was with his brother for part of the time and with May for part of it. His brother did not testify and May could not say when he returned to her apartment. Evidence that would show he could not have been at Kamps' apartment when the eyewitness said he was would be significant in regard to the results at a new

interest in Kamps which she rebuffed and Armstrong's lies to police and on the witness stand.

trial. The DNA evidence presented here does not affect the time testimony and the eyewitness testimony of both Armstrong's car and of him, which were critical to his conviction.

¶ 179. The newly discovered evidence offered here is much different in its impact from the evidence that was presented in *State v. Hicks,* 202 Wis. 2d 150, 549 N.W.2d 435 (1996).[8] In *Hicks,* the question was whether Hicks had *ever* been in the victim's apartment. There were only two pieces of evidence tying him to that apartment at trial, one of which was later disproved. The impact of the evidence in *Hicks* is a far cry from the impact of the DNA evidence Armstrong proffers because of the overwhelming amount of evidence that was presented to the jury in Armstrong's case. Accordingly, I conclude that the newly discovered DNA evidence does not make it reasonably probable that a different result would be reached.

## B. Real Controversy Not Fully Tried

¶ 180. Instead of applying the newly discovered evidence test as I have above, a test that Armstrong fails to pass, the majority reverses Armstrong's judgment of conviction on the theory that the real controversy was not fully tried. Majority op., ¶ 156. In doing so, the majority opinion misapplies our precedent and equates the idea of the "matter not being fully tried" with new scientific identification procedures in a way that threatens to reopen convictions statewide every

---

[8] *State v. Hicks,* 202 Wis. 2d 150, 549 N.W.2d 435 (1996), was not argued as a newly discovered evidence case. Nor could it have been, because DNA tests were available and known to Hicks' attorney, who chose not to do them for what he believed were tactical reasons.

716

time a scientific improvement occurs, regardless of the lack of a probable effect on the issues underlying the jury's verdict. Because the facts of this case do not meet the criteria necessary to reversing a conviction under our long-standing jurisprudence regarding the real controversy being fully tried, I would not reverse the court of appeals on this basis.

¶ 181. The ability of this court to set aside a conviction through the use of our discretionary-reversal powers has often been discussed.[9] In *State v. Schumacher*, 144 Wis. 2d 388, 424 N.W.2d 672 (1988), we identified two avenues for its use: when the real controversy has not been fully tried and when there has been a miscarriage of justice. *Id.* at 400. The proper analysis of a motion to set aside a conviction based on our discretionary-reversal powers was carefully laid out in *Schumacher* and many cases since then.

> [U]nder the "real controversy not fully tried" category, two different situations were included: (1) Either the jury was not given an opportunity to hear important testimony that bore on an important issue in the case, or (2) the jury had before it testimony or evidence which had been improperly admitted, and this material obscured a crucial issue and prevented the real controversy from being fully tried.
>
> Under the second prong of the discretionary-reversal statute, the "miscarriage of justice" prong, the case law made clear that, in order to grant a discretionary reversal under this prong, the court would have to conclude that there would be a substantial probability that a different result would be likely on retrial.

---

[9] Our discretionary power to reverse judgments arises from both statute and common law. *Vollmer v. Luety,* 156 Wis. 2d 1, 13, 456 N.W.2d 797 (1990).

*Id.* at 400–01 (citing *State v. Wyss,* 124 Wis. 2d 681, 741, 370 N.W.2d 745 (1985)). As we explained in *Schumacher* and have repeated many times since, "this broad discretionary-review power . . . is . . . to be used sparingly, and only in exceptional circumstances." *Schumacher,* 144 Wis. 2d at 407 (citing *State v. Cuyler,* 110 Wis. 2d 133, 141, 327 N.W.2d 662 (1983)).

¶ 182. The majority opinion seems to rely on a belief that the hair testimony "obscured a crucial issue," thereby preventing the real controversy from being fully tried. Majority op., ¶ 115. Its discussion focuses mainly on *Hicks.* Majority op., ¶¶ 117–35. The majority opinion bases its decision on what it characterizes as the "striking similarities" between *Hicks* and the present case. Majority op., ¶ 116.

¶ 183. I do not agree that *Hicks* and the present case are similar. Instead, as I explain below, the two cases are dissimilar in all respects that are material to whether the real controversy was fully tried. In *Hicks,* the issue the majority opinion turned upon was whether Hicks' claim that he had never been in the victim's apartment was fully tried due to Hicks' attorney choosing not to pursue DNA testing of hairs recovered there. *Hicks,* 202 Wis. 2d at 163–64.

¶ 184. Hicks' presence in the victim's apartment, or the lack of his presence, was pivotal to the case because Hicks is an African-American and the victim said that no other African-American male had been in her apartment except the perpetrator of the crime. *Id.* at 155. Five African-American hairs were found in the victim's apartment. It was the State's theory at trial that all five hairs came from the same person: the perpetrator. *Id.* at 165. It was Hicks' defense "that he had never been in [the victim's] apartment and could not have been the source of hairs that were found

there." *Id.* at 163. Although DNA testing was available at the time of Hicks' trial, his trial counsel chose not to have the hair evidence DNA tested. *Id.* at 155.

¶ 185. After Hicks' conviction, DNA analysis was performed on the hair specimens. The results obtained from some of the specimens were inconclusive, but on two specimens, Hicks was ruled out as the source of the DNA. *Id.* at 156. Therefore, the following syllogism was set up: if all the hair came from the same person, the hairs were from an African-American, and the only African-American who had been in the victim's apartment was the perpetrator of the crime, then Hicks could not have been the perpetrator. Accordingly, we concluded that the issue of whether Hicks had been in the victim's apartment was not fully tried and Hicks was entitled to a new trial. *Id.* at 171–72.

¶ 186. In the present case, as in *Hicks,* hair recovered from the crime scene was inculpatory of the defendant at the time of trial, and some of it was later proved not to be the defendant's. However, there the similarity to *Hicks* ends. Armstrong said he had been in Kamps' apartment. Therefore, finding hair consistent with Armstrong's did not undermine his defense. The time evidence and the eyewitness identifications of his car and of him at Kamps' apartment during the time when she was murdered undermined his defense extensively.

¶ 187. There is another point that bears mentioning with regard to the DNA evidence at issue here. What was presented at trial was not "false evidence," a characterization of Armstrong's that the court of appeals picked up. *State v. Armstrong,* Nos. 2001AP2789 and 2002AP2979, unpublished slip op., ¶ 37 (Wis. Ct. App. May 27, 2004). Wegner's testimony about her analyses of the hair samples explained that Armstrong

719

could not be excluded as the donor of six hairs *by the tests that she ran.* She also explained that those tests could not identify a hair's donor. There was nothing "false" about this testimony. It accurately described the capability of the tests she conducted relative to the hairs analyzed. That there are more accurate DNA tests now available does not change the capability of Wegner's tests or cause her testimony about them to become "false."

¶ 188. In the present case, the majority opinion states, "First the jury did not hear important DNA evidence that bore on an important issue of the case." Majority op., ¶ 115. Of course the jury did not hear the DNA evidence. It did not exist at the time of the trial. Likewise, the expert testimony regarding the hairs found in Kamps' apartment was properly admitted at the time of the trial. It strains the meaning of "fully tried" to suggest that Armstrong's case was not fully tried because the scientific bases for physical evidence set forth in the trial were only *state-of-the-art at the time of the trial,* but not state-of-the-art at present. Using the majority's standard, the real controversy can never be fully tried because scientific advances in evidence gathering and analysis will continue to improve. The majority opinion's explanation of how the DNA evidence fits into the theory that the real controversy was not fully tried shows the fallacy in using that test and is an additional reason why the proper avenue to handle cases where new evidence is obtained is, as I have explained above, the newly discovered evidence test. The newly discovered evidence test is best suited to analyzing the new evidence in the context of its impact on all the other evidence presented at trial. Therefore, for the foregoing reasons, I reject the use of

discretionary reversal under the rubric of the real controversy not fully tried.

## II. CONCLUSION

¶ 189. Accordingly, because I conclude that the DNA evidence does not create a reasonable probability that a different result would be reached at a new trial, and because I conclude that the real controversy, whether Armstrong raped and murdered Charise Kamps, was fully tried in 1981, I respectfully dissent from the majority opinion.

¶ 190. I am authorized to state that Justices JON P. WILCOX and DAVID T. PROSSER join this dissent.